ATTORNEYS FOR APPELLANT

Stacy R. Uliana
Indianapolis, Indiana

Katharine C. Liell
Liell & McNeil Attorneys PC
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Stephen R. Creason
Deputy Attorney General

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana

AMICUS CURIAE FOR APPELLANT

F. Thomas Schornhorst
Bloomington, Indiana



FILED
Jun 26 2009, 10:41 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 87S00-0612-CR-499

DAVID R. CAMM,                                      *Appellant (Defendant below),*

v.

STATE OF INDIANA,                                  *Appellee (Plaintiff below).*

Appeal from the Warrick Superior Court, No. 87D02-0506-MR-54
The Honorable Robert R. Aylsworth, Judge

On Direct Appeal

**June 26, 2009**

**Dickson, Justice.**

The defendant, David R. Camm, appeals his three convictions and sentence of life imprisonment without parole for murdering his wife and two children. We reverse and remand for a new trial.

This was the defendant's second trial. In 2002 a jury convicted him of Murder for the shooting deaths of his wife, their seven-year-old son, and their five-year-old daughter at the family home in Georgetown, Indiana. In that trial, the jury rejected the defendant's alibi that he had been playing basketball at a nearby church at the time his family was killed, and "[t]he key physical evidence . . . was the purported high velocity blood spatter on [the defendant's] t-shirt." Camm v. State, 812 N.E.2d 1127, 1129-30 (Ind. Ct. App. 2004), *trans denied*. The Court of Appeals reversed, finding that the defendant was prejudiced by the State's introduction of evidence regarding his poor character—i.e., his extramarital conduct—in violation of Indiana Evidence Rule 404(b). *Id.* at 1142.

The State reinvestigated the killings and soon connected a man named Charles Boney. The State discovered Boney's DNA on a sweatshirt that had been tucked under the son's body. Because Boney had not figured in the first trial, this marked a major development in the case. Police questioned Boney, and he admitted having owned the sweatshirt but claimed to have donated it to the Salvation Army. Later, police definitively matched him to a palm print found at the scene. After his arrest, Boney provided inconsistent stories but ultimately asserted that he had provided a gun for the defendant and was present when the three victims were shot and killed.

Following the reversal and remand, the parties agreed to change venue from the Floyd Superior Court to Warrick Superior Court No. 2, and that court assumed jurisdiction over the case. The State later dismissed the charges without prejudice and recharged the defendant in Floyd Circuit Court with the three counts of Murder while adding a charge of Conspiracy to Commit Murder. The defendant contested this procedure by filing an original action in this Court, and we ordered venue transferred back to Warrick Superior Court No. 2. The case was transferred, and the State sought a sentence of life without the possibility of parole.

The defendant's second trial in Warrick County began on January 16, 2006. The State's evidence at the second trial substantially mirrored that at the first: forensic evidence, expert testimony, and circumstantial evidence pointed to the defendant as the perpetrator, as well as the defendant's alleged confession to three inmates. Added, however, was evidence regarding Boney

as a co-conspirator, and more evidence regarding the defendant's alleged molestation of his daughter. As to motive, the State's theory was that the defendant had molested his daughter, the daughter either had reported or would report the abuse to her mother, and the defendant killed his family to conceal the molestation. To advance this theory, the State introduced autopsy evidence revealing blunt force trauma to the daughter's external genital region and expert testimony opining that the daughter had been sexually molested within the twenty-four hours preceding her death.

At trial, Boney's presence at the scene was undisputed.[1] The defense maintained that Boney was the sole perpetrator. In furtherance of this theory, the defense offered evidence of Boney's prior assaults on women and sexual compulsion for feet, his alleged reputation for dishonesty, his failed stipulated polygraph test, and certain inculpatory out-of-court statements. The trial court excluded all of this evidence. The defense also presented testimony that supported the defendant's alibi that he had been playing basketball at the time of the killings and which attacked the State's experts' analysis of the bloodstain patterns on the defendant's clothing.

At the close of the State's case-in-chief, the trial court entered judgment on the evidence in favor of the defendant on the Conspiracy charge. Tr. 108 (w. 6, vol. I); Appellant's App'x at 147. At the close of trial, the jury convicted the defendant on all three Murder counts. The trial court entered judgment on the convictions and sentenced the defendant to a term of life without parole. Following an unsuccessful motion to correct error, the defendant filed this appeal. Because the defendant was sentenced to life without the possibility of parole, this Court has jurisdiction under Indiana Appellate Rule 4(A)(1)(a).

The defendant challenges his conviction on four general grounds: (1) the trial court committed reversible error by allowing the State to strike a female juror without a gender neutral reason; (2) evidence was both improperly admitted and excluded, prejudicing the defendant and impinging upon his right to present a defense under the Sixth Amendment to the United States

---

[1] In a separate trial, Boney was convicted of three counts of Murder, Ind. Code. § 35-42-1-1, one count of Conspiracy to Commit Murder, *id.* § 35-42-1-1; 35-42-5-2, and was found to be a habitual offender, *id.* § 35-50-2-8. Boney v. State, 880 N.E.2d 279 (Ind. Ct. App. 2008), *trans. denied*.

Constitution; (3) the State committed misconduct in charging the defendant with conspiracy in order to frame logically exculpating evidence as inculpating evidence; and (4) the evidence is insufficient to support his conviction. Two particular claims independently require reversal. Specifically, the trial court committed reversible error in allowing speculative evidence and argument that the defendant molested his daughter and in admitting an out-of-court statement that the defendant's wife made to a friend regarding the time she expected to see the defendant at home on the night of the murders. But because sufficient evidence supports the convictions,[2] the defendant may be retried, and so we address the other raised issues that are likely to arise on retrial.

## 1. Speculation regarding whether the defendant molested his daughter

The first ground requiring reversal is the State's repeated emphasis upon speculation that the defendant molested his daughter.

At trial, the State introduced autopsy evidence revealing blunt force trauma to the daughter's external genital region.[3] Dr. Corey, a medical examiner, testified for the State that these injuries were consistent with either sexual molestation or a "straddle fall." Tr. 665, 695 (w. 5, vol. III). Drs. Spivack and Merk, both pediatricians, also testified for the State and opined that these injuries were inflicted "no more than a couple of days at most and probably somewhat less than that," and were "most likely . . . the result of sexual abuse." Tr. 21, 70-71 (w. 6, vol. I). In addition, on redirect Dr. Spivack agreed with the State's hypothetical that the daughter, if she had been molested, likely would have told her mother of the source of her injury. *Id.* at 43-44. Later, the State's closing argument was premised on this hypothesis and culminated with this statement:

---

[2] The constitutional prohibition against double jeopardy does not prevent retrial following a reversal due to the erroneous admission of evidence if the totality of the evidence, including that erroneously admitted, was sufficient to support the conviction. Lockhart v. Nelson, 488 U.S. 33, 40-42, 109 S.Ct. 285, 290-92, 102 L.Ed.2d 265, 273-74 (1988); Bowman v. State, 577 N.E.2d 569, 571 (Ind. 1991).

[3] On appeal, the defendant disputes the relevance of this medical evidence showing blunt force trauma to the daughter's genitals but, by failing to object to its introduction at trial, he has waived review. *See* Br. of Appellant at 21 (conceding that he "did not object to the injuries"). Seeking to avoid waiver, the defendant claims its admission rises to the level of fundamental error requiring reversal on appeal. We decline to find this to be fundamental error.

"He killed the witnesses. He couldn't tell his . . . buddies why he was getting divorced because he molested his five-year-old daughter and he watched them die and watched his son die." Tr. 1-5, 96, 197 (w. 8, vol. I). Although the State was permitted to emphasize its molestation allegation, the trial court balked several times at the lack of any evidence implicating the defendant. *See* Appellant's App'x at 627 (before trial: "the record currently before the court shows no more than suggestion and suspicion, at best"); *id.* at 761 ("[U]ntil adequate connecting evidence to the defendant is established outside the presence of the jury, any alleged evidence with regard to the defendant Camm is not admissible and shall not be offered to the jury hearing this case."); Tr. 223 (w. 3, vol. I) (repeating this admonition).

The defendant argues that the trial court abused its discretion by allowing the State to stack inference upon inference of molestation to build its case. As he puts it: "The fact that [the daughter] had non-specific trauma descended into opinions that [the daughter] was painfully molested which, in turn, descended into the State's argument that [the defendant] molested [the daughter], who told her mother, who decided to leave [the defendant]." Br. of Appellant at 20-21. The State counters that the defendant waived his arguments by failing to object at trial and that, under Evidence Rule 404(b), the daughter's alleged molestation was relevant to show the defendant's motive.

With regard to waiver, the State argues that the defendant did not object when Dr. Corey testified that the daughter's injuries were likely cause by sexual molestation, and only objected to Drs. Spivack and Merk's testimony on cumulative grounds. Although the defendant filed a motion in limine specifically objecting to this molestation line of inquiry, "[o]nly trial objections, not motions in limine, are effective to preserve claims of error for appellate review." Raess v. Doescher, 883 N.E.2d 790, 796 (Ind. 2008). The trial objection must "stat[e] the specific ground for objection, if [it is] not apparent from the context," so that "[a] mere general objection, or an objection on grounds other than those raised on appeal, is ineffective to preserve an argument for appellate review." *Id.* at 797 (internal quotation marks omitted). This specificity argument serves "to alert the trial judge fully of the legal issue." *Id.* (internal quotation marks omitted).

To show preservation of the issue, the defendant speaks to specific objections made during trial. First, the record shows that before Dr. Spivack's testimony, defense counsel made inaudible objections at a bench conference. Although the State claims this objection was based solely on the cumulative nature of Dr. Spivack's testimony, the trial court's transcribed ruling shows otherwise: "I'll grant the motion with regard to that. I think clearly *speculation* on her part that they may or may not have occurred, or could have possibly occurred. I'll let her testify as to any findings she may have made, but I'll grant the order with regard to that issue." Tr. 1 (w. 6, vol. I) (emphasis added). Second, when the State asked Dr. Spivack whether the daughter would likely have reported her injuries to her mother, the defendant again objected on grounds that the answer called for speculation. Third, when Dr. Merk took the witness stand, defense counsel objected on grounds that this additional testimony was cumulative. Fourth, the defendant, both before closing arguments (anticipating that the State would reference molestation) and after (when the State in fact did so) made a continuing objection: "I just want to make sure that the Court recognizes as a continuing objection to what we believe is an improper argument of any— to argue that [the defendant] molested [the daughter] in any way . . . the 404(b) objection." Tr. 96 (w. 8, vol. I). The trial court acknowledged this objection. *Id.*

This is not a clear case of preservation. The trial court, for example, while acknowledging that defense counsel lodged several objections, held that they came too late, finding that the "fact that [the daughter] may have been abused at or very near the time she was killed had been admitted into evidence on one or more occasions, without objection." Appellant's Supp. App'x at 67 (Certified Statement of Evidence). To be sure, the record shows that at times both the State and defendant acted as if evidence of the daughter's injuries was relevant to establish the killer's motive. *See, e.g.*, Tr. 22, 45 (w. 2, vol. I); Tr. 690-94 (w. 5, vol. III); Tr. 36 (w. 6, vol. I); Tr. 74-77, 103 (w. 7, vol. I); Tr. 143-44, 146-50, 171, 181-82 (w. 8, vol. I). In addition, the defendant opened the door to some of Dr. Spivack's redirect testimony by suggesting that the daughter had not reported her injuries and that Dr. Spivack lacked a concrete basis for her assessment that there was a "high degree of probability" that the daughter had been molested. *See, e.g.*, Kubsch v. State, 784 N.E.2d 905, 919 n.6 (Ind. 2003) ("Otherwise inadmissible evidence may become admissible where the defendant 'opens the door' to questioning on that evidence."). Nor did the defendant request an admonishment and mistrial *during* the State's closing argument. *See* Coop-

6

er v. State, 854 N.E.2d 831, 835 (Ind. 2006) ("When an improper argument is alleged to have been made, the correct procedure is to request the trial court to admonish the jury. If the party is not satisfied with the admonishment, then he or she should move for mistrial. Failure to request an admonishment or to move for mistrial results in waiver." (internal citations omitted)).

But, for at least two reasons, to apply the waiver rule with unyielding rigidity in this case risks absurdity. First, the defendant consistently objected to the speculation of these experts and the hypothesis that he was the molester—before, during, and after trial—and the trial court was well aware of the issue. The overriding purpose of the requirement for a specific and timely objection is to alert the trial court so that it may avoid error or promptly minimize harm from an error that might otherwise require reversal, result in a miscarriage of justice, or waste time and resources. *See* Godby v. State, 736 N.E.2d 252, 255 (Ind. 2000). And second, while the defendant made arguments from this evidence, the thrust of the defendant's argument appears to have been that Boney acted alone and sexually attacked the wife, not the daughter. *See* Tr. 143-44 (w. 8, vol. I). It was the State that first filed a notice of intent to offer the molestation allegation as Rule 404(b) evidence, Appellant's App'x at 341, while the defendant fought to exclude the argument, *id.* at 481-82 (motion in limine); *id.* 598-604 (memorandum challenging pediatricians' argument). It was the State that first brought up the topic at trial in their opening statement: "And you'll hear also from Drs. Merk and Spivack that within 24 hours of little Jill's death, from her blood being sprayed upon her dad's shirt, that she was sexually molested." Tr. 11 (w. 2, vol. I). If anything, the defendant's trial tactics were merely an attempt to defend himself against this allegation, and it is axiomatic that "the State cannot bootstrap . . . evidence into admissibility by putting it in, forcing a denial, and then claiming it was put in issue by the defendant." Bassett v. State, 795 N.E.2d 1050, 1052 (Ind. 2003) (internal citations omitted). If this rule is to have any force, a defendant must be able vigorously to challenge erroneously admitted evidence without conceding the issue on appeal. We find the issue properly preserved for appeal.

Rule 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but may "be admissible for other purposes, such as proof of motive." The law governing the admissibility of specific acts evidence for "other purposes" requires a trial court to make three findings. First, the

court must "determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act." Wilson v. State, 765 N.E.2d 1265, 1270 (Ind. 2002) (internal citation omitted). Second, the court must determine that the proponent has sufficient proof that the person who allegedly committed the act did, in fact, commit the act. Clemens v. State, 610 N.E.2d 236, 242 (Ind. 1993). And third, the court must "balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403." Wilson, 765 N.E.2d at 1270. The evidence adduced at trial failed to satisfy two of these three prongs.

As an initial matter, "[e]vidence of motive is always relevant in the proof of a crime," *id.*—and it was in this case. For the State, evidence that the defendant molested his daughter within hours of her death would be highly relevant under Rule 404(b) as non-character proof of his motive. Nevertheless, on this record the State failed sufficiently to connect the daughter's injuries to the defendant. When conflicting evidence persists about a person's involvement in Rule 404(b) specific acts, the question is one of conditional relevance, which is governed by Rule 104(b). Under Rule 104(b), "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the Court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." There must be sufficient proof from which a reasonable jury could find the uncharged conduct proven by a preponderance of the evidence. Clemens, 610 N.E.2d at 242 (adopting Huddleston v. United States, 485 U.S. 681, 690, 108 S.Ct. 1496, 1501, 99 L.E.2d 771 (1988)). If the trial court finds this threshold showing met (or likely to be met), it properly admits the offered items and leaves to the jury the task of assessing their persuasive value.

In this case, relevance of the molestation as motive was conditioned upon proof of two premises: (1) the daughter's groin injuries resulted from molestation, and (2) the defendant was the molester. *See* Br. of Amicus at 4-6. As explained, the State introduced expert testimony that the daughter's groin injuries were consistent with sexual abuse, and although some testimony suggested otherwise, Tr. 103 (w. 7, vol. I) (Dr. Nichols: very low possibility of molestation), the record evidence adequately supported an inference that the daughter was molested. Yet that expressed opinion makes it no more likely that the defendant was blameworthy. Missing from this

record is any competent evidence of the premise that the defendant molested the child, a hole in proof the State admits. Br. of Appellee at 28. Rather, the State seems to reason that the temporal proximity (probably less than twenty-four hours) between the daughter's injuries (probably from molestation) and her murder (probably at the defendant's hands) is highly probative of motive. As persuasively explained by amicus curiae F. Thomas Schornhorst, the circularity of this reasoning is apparent: the defendant probably was the killer, so he probably was the molester, so he probably was the killer. *See* Br. of Amicus at 10-11.

The value of specific acts evidence to prove motive rests on the strength of proof that the defendant in fact committed that other act. With no evidence connecting the defendant to the injuries, the inquiry lacked purpose. *See* Huddleston, 485 U.S. at 689, 108 S.Ct. at 1501, 99 L.Ed.2d at 782 ("[S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."); Howell v. State, 413 N.E.2d 225, 226 (Ind. 1980) ("[I]t goes without saying that there must be evidence of probative value showing that the defendant actually engaged in those acts."). In Wells v. State, for example, we held that it was error in a murder trial to admit evidence that bullets fired during an unrelated shooting at the defendant's workplace came from the same weapon as the bullet that killed the victim where the only evidence linking the defendant to the other shooting was a security guard's testimony that he had received an anonymous tip inculpating the defendant. 441 N.E.2d 458, 462-63 (Ind. 1982).

But even if the minimum standards of Rules 404(b) and 104(b) were met, the risk of unfair prejudice substantially outweighed its modest probative value. *See* Ind. R. Evid. 403. "Unfair prejudice . . . looks to the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper basis." Ingram v. State, 715 N.E.2d 405, 407 (Ind. 1999) (internal quotation marks omitted). The allegation was volatile, something the Court of Appeals foreshadowed in its 2004 opinion vacating the defendant's first set of convictions. At the first trial, the State introduced evidence that the daughter possibly had been molested hours before her death, that the defendant was the most likely perpetrator, and that he had killed his family to cover up his crime. Camm, 812 N.E.2d at 1140. The Court of Appeals did not address whether the evidence should have been excluded had a proper objection been lodged,

but it did observe: "Given the arguments made on appeal, we anticipate in the event of a retrial that [the defendant] will object to the introduction of this evidence. If that is the case, the trial court will need to *carefully consider whether the highly inflammatory nature of this evidence* substantially outweighs the probative value of any evidence that [the defendant] molested [his daughter]." *Id.* (emphasis added). That apprehension was fulfilled in the defendant's second trial: the evidence and argument presented regarding whether he molested his daughter was speculative at best and far more prejudicial than probative.

The State urges that the admission of this evidence and argument was harmless error. We disagree. "Harmless error is error that does not affect the substantial rights of a party given the error's likely impact on the jury in light of other evidence presented at trial." Raess, 883 N.E.2d at 801. Here the prejudicial impact is vividly evident. The State's theory, that the defendant murdered his family to conceal the molestation, pervaded the trial from the State's opening statement to its closing argument. Reports of juror statements after announcing their verdict also strongly indicate the jury impact of the molestation claim.[4] *See, e.g.*, Krumm v. State, 793 N.E.2d 1170, 1182-83 (Ind. Ct. App. 2003) ("We have often concluded pursuant to Ind. Evidence Rule 404(b) that the admission of evidence of prior acts of child molesting or sexual assault are so prejudicial as to be reversible error." (collecting cases)).

The erroneous admission of speculative evidence and argument that the defendant molested his daughter, combined with the State's use of this evidence as the foundation of its case, requires that the convictions be reversed.

**2. The statement that the wife expected the defendant home between 7:00-7:30 p.m.**

---

[4] The jury, somewhat unusually, held a press conference after the defendant's sentencing, and the defendant introduced in his motion to correct error a news article reporting on this conference. The article's headline is telling: "The Jurors Speak: Molestation evidence led to guilty verdict." *See* Appellant's App'x at 1050. The article speaks to the deciding factor in the conviction: "[The defendant] was the only person who could have molested his daughter in the two days before her murder." *Id.* Though the article acknowledges that the jury considered other matters, the crux is that it convicted the defendant because it believed he molested his daughter. *Id.*

Another ground that would independently require reversal is the defendant's contention that the trial court erred in allowing his wife's friend, Cindy Mattingly, to testify concerning an out-of-court statement made by his wife. On the day of the murders, the two women spoke during their daughters' dance class. And "during a normal, every day-type conversation about how busy life was, and in response to [her friend's] statement as to when she expected her husband home," Appellant's Br. at 30, the defendant's wife told the friend that "she was expecting her husband home between 7:00 and 7:30, around that time," Tr. 288 (w. 5, vol. II). This testimony was received at trial over the defendant's hearsay objection.

A trial court exercises broad discretion in ruling on the admissibility of evidence, and an appellate court should disturb its rulings only where it is shown that the court abused its discretion. Griffith v. State, 788 N.E.2d 835, 839 (Ind. 2003). In deciding whether to admit an out-of-court statement, a trial court must answer two preliminary questions: Is the statement hearsay, and, if so, does an exception apply? As to the first question, the State, defendant, and trial court agreed that the wife's statement is hearsay. What divided the parties was whether the statement properly fell within a hearsay exception. Supporting the trial court's decision, the State insists that Evidence Rule 803(3) allowed the friend's testimony as a state-of-mind declaration. The defendant, on the other hand, argues that his wife's statement of belief as to his future actions, when offered to prove those actions, falls outside Rule 803(3)'s purview.

Rule 803(3) creates a hearsay exception for statements of the declarant's then-existing state of mind at the time the statement was made. State of mind, as that term is defined, may include emotion, sensation, physical condition, intent, plan, motive, design, mental feeling, pain, and bodily health.

In criminal cases involving out-of-court statements of a victim's state of mind, this Court has identified three "instances where such statements may be admissible." Ford v. State, 704 N.E.2d 457, 459-60 (Ind. 1998). The first is to respond "when the defendant puts the victim's state of mind in issue." Hatcher v. State, 735 N.E.2d 1155, 1161 (Ind. 2000); *see, e.g.*, Ford, 704 N.E.2d at 459-60 (victim's statement to witness that "she was unhappy and that she wanted to leave but she was afraid that if she left [the defendant] again he would kill her" was admissible

11

as indicative of her state of mind). The defendant did not put his wife's state of mind in issue in this case, and the State does not argue that this theory should apply. The second—"to explain physical injuries suffered by the victim," Hatcher, 735 N.E.2d at 1161—this Court applied in Nicks v. State, 598 N.E.2d 520, 525 (Ind. 1992), to admit remarks of a murder victim "to demonstrate the victim's explanation of prior injuries inflicted by the defendant." This is likewise inapplicable. The third is presented in this case: "[T]o show the intent of the victim to act in a particular way." Hatcher, 735 N.E.2d at 1161.

Regarding this theory, such declarations may be admitted not only as proof of the declarant's then-existing state of mind, but also as circumstantial evidence of the declarant's *future conduct*. *See* Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S. Ct. 909, 36 L.Ed. 706 (1892). A jury may infer from the declarant's past state of mind that the declarant held the same mental state at a future time and acted on it. Courts permit this sub-category of evidence because it lacks many of the dangers traditionally associated with hearsay: a jury's connecting a declarant's expressed mental state to their actions requires inferring only that one generally does what they intend, with no need to appraise memory, perception, or testimonial qualities. *See* Ronald J. Allen, Richard B. Kuhns & Eleanor Swift, Evidence: Text, Problems, and Cases 572-73 (3d ed. 2002). This Court's cases have repeatedly permitted such use under Rule 803(3). *See, e.g.*, Taylor v. State, 659 N.E.2d 535, 543 (Ind. 1995); Carter v. State, 501 N.E.2d 439, 441-42 (Ind. 1986) (co-defendant's statement, during a conversation about drugs, that he would "check with [the defendant] to see if it was available," explained the declarant's later phone call to the defendant (citing Hillmon)); Dunaway v. State, 440 N.E.2d 682, 686 (Ind. 1982) ("The statements indicate a fearful state of mind which would circumstantially explain her later action of attempting to hit defendant.").

But the wife did not say, "*I* plan to be home between 7:00 and 7:30 p.m." Rather, her statement more directly relayed a belief about the *defendant's* future act of returning home. (Indeed, this is apparently the interpretation the friend gave the statement. Tr. 275 (w. 5, vol. II).) And the State repeatedly manipulated her expectation as to the defendant's arrival time into evidence of her intent to *meet* the defendant at 7:30 p.m. When examining the friend, the State repeated the statement and asked her if she was positive. *Id.* at 289. The State asked a medical

expert, over the defendant's objection, if she was "aware that Kim Camm was supposed to meet [the defendant] at 7:30 the night of the murders." Tr. 48 (w. 6, vol. I). During a basketball player's cross-examination, the State asked if the defendant talked to him "about meeting his wife at 7:30." Tr. 577 (w. 7, vol. III). In closing, the State asserted that the wife said "she was going to meet [the defendant] between 7:00 and 7:30," Tr. 131 (w. 8, vol. I), and that the defendant told his wife "to meet him at that house," *id.* at 196. Finally, the State used the statement to speculate that the wife was meeting the defendant to confront him about molesting his daughter. *Id.* at 131.

When admitted as circumstantial proof of the fact believed, as here, the evidence ceased to be a statement of the declarant's state of mind but rather was a statement of her expectation of the defendant's actions, and one which lacked a foundation about the basis for that expectation. The relevance of the wife's expectation necessarily depended on her accurate perception and memory: she could not know the defendant's plans without perceiving and remembering some past fact—something the defendant (or some other person) said or did to indicate that he would arrive home at that time. The wife's statement is thus no more reliable than any other classic form of hearsay, and this unreliability erodes the basis for admitting state-of-mind declarations in the first place. *See* 2 McCormick on Evidence § 275 (6th ed. 2006) ("The danger of unreliability is greatly increased when the action sought to be proved is not one that the declarant could have performed alone, but rather is one that required the cooperation of another person.").

Indeed, had the wife's statement explicitly related the basis for her knowledge of the defendant's intent (e.g., that the defendant had phoned her), arguably making the statement more reliable, a trial court could not admit that additional fact because it would be a statement of memory or belief, offered to prove the fact believed. *See, e.g.*, United States v. Cohen, 631 F.2d 1223, 1225 (5th Cir. 1980) ("[T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind."). The logic that compels excluding explicit references applies even more forcefully to implication: It necessarily depends on the wife's accurate knowledge of some past fact about the defendant, without which her statement

13

amounted to irrelevant speculation, and which was impossible for the defendant to cross-examine.

These concerns were highlighted in the Committee Notes accompanying Indiana's own Rule 803(3),[5] and several states, either by rule[6] or through case law,[7] disallow the use of state-of-mind declarations to prove a third party's conduct. We agree, and hold that, while state-of-mind declarations are admissible under Rule 803(3) when offered to prove or explain acts or conduct of the declarant, they are not admissible when offered to prove a third party's conduct. Because the wife's statement expressed a belief about the defendant's future plans, and was used as evidence of what the defendant in fact did, the admission of the wife's hearsay statement was an abuse of discretion.

And while the State suggests that the statement is probative of whether the defendant's wife actually arrived home at those times, Br. of Appellee at 32, this rationale finds little support in this case. The wife's being at home at 7:30 p.m. was not contested—yet even if relevant for that narrow purpose, common sense shows too high a risk that the jury would misuse the statement to infer the defendant's act. *Cf.* Carter, 490 N.E.2d at 291-92 (relying in part on "[t]he trial

---

[5] The Committee concluded that

> [The question] [w]hether statements of intent by one person should be admitted to prove that another person did an act has always been controversial. The usual context is a statement by a crime victim that the victim is going out to meet the defendant, offered to prove that the victim in fact met the defendant. *The committee fails to see the connection, because the victim has no control over what the defendant does, and therefore the victim's intent cannot influence the defendant.*

Burns Ind. Statutes Annotated, 2009 Code Ed., at 675 (emphasis added). This Court did not formally adopt the committee commentary, but has in the past relied on it. *See, e.g.*, Specht v. State, 734 N.E.2d 239, 240 (Ind. 2000) (relying in part on commentary to Rule 609(a)); *see also* Atwell v. State, 738 N.E.2d 332, 335 n.3 (Ind. Ct. App. 2000) (relying on the commentary to Rule 106); Stanage v. State, 674 N.E.2d 214, 216 (Ind. Ct. App. 1996) (same).

[6] *See, e.g.*, Alaska R. Evid. 803(3); Cal. Evid. Code § 1250; Fla. Stat. Ann. § 90.803(3); La. Code Evid. art. 803(3); Md. R. Evid. 5-803(b)(3).

[7] *See* State v. Phillips, 461 S.E.2d 75, 90-91 (W. Va. 1995); State v. Krone, 897 P.2d 621, 625-26 (Ariz. 1995) (Feldman, C.J., specially concurring); People v. Lawler, 568 N.E.2d 895, 900 (Ill. 1991); State v. Vestal, 180 S.E.2d 755, 773 (N.C. 1971); State v. Perelli, 5 A.2d 705, 707 (Conn. 1939); State v. Engweiler, 846 P.2d 1163, 1164-65 (Or. Ct. App. 1993); People v. Franklin, 782 P.2d 1202, 1206 (Colo. Ct. App. 1989).

14

court [having] properly admonished the jury"). We hold that it was error to admit the friend's testimony that she heard the defendant's wife state the time she was expecting her husband home.

Errors in the admission of evidence, however, will be disregard as harmless unless they affect a party's substantial rights. Ind. Trial R. 61. Stated another way, "an error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." Fleener v. State, 656 N.E.2d 1140, 1142 (Ind. 1995).

In view of conflicting evidence concerning the defendant's alibi, we cannot conclude that the error in admitting this evidence was harmless. At trial, it was undisputed that the murders occurred around 7:30 p.m. It was also largely undisputed that the defendant was playing basketball at a nearby gym from around 7:00 p.m. to 9:22 p.m. Tr. 1033-34, 1041-42 (w. 7, vol. V). The State's theory was that the defendant snuck out of the game, murdered his family, and returned to the gym. Br. of Appellee at 3; Tr. 165 (w. 3, vol. I); Tr. 822 (w. 3, vol. IV). The defendant notes several witnesses—others playing basketball that evening—who testified that the defendant sat out only one game and who observed him on the sidelines. Tr. 843 (w. 5, vol. IV); Tr. 512-13 (w. 7, vol. III). The wife's hearsay statement was thus critical evidence placing the defendant at the scene at the key time, and its admission was reversible error.

### 3. Sufficiency of the evidence

The defendant also argues that insufficient evidence supported the jury's verdict that he murdered his wife and two children, requiring not just reversal of his convictions but outright dismissal of the charges. Perkins v. State, 542 N.E.2d 549, 550-51 (Ind. 1989); *see* Burks v. United States, 437 U.S. 1, 10-11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1, 9 (1978).

An appellate court evaluating the sufficiency of the evidence presented at trial "will not weigh conflicting evidence or judge the credibility of witnesses." Wright v. State, 690 N.E.2d 1098, 1106 (Ind. 1997). The court should uphold a conviction so long as the evidence, when viewed in the light most favorable to the judgment, could justify a reasonable jury in finding the

elements of the crime charged proven beyond a reasonable doubt. <u>Tobar v. State</u>, 740 N.E.2d 109, 111-12 (Ind. 2000). Moreover, circumstantial evidence alone may be sufficient to sustain a conviction, <u>Rohr v. State</u>, 866 N.E.2d 242, 249 (Ind. 2007); it is "not necessary that the evidence overcome every reasonable hypothesis of innocence," <u>Drane v. State</u>, 867 N.E.2d 144, 147 (Ind. 2007) (internal quotation marks omitted); and the reviewing court considers the evidence as presented at trial, including that which may have been erroneously admitted, <u>Joyner</u>, 678 N.E.2d at 390; *see also* <u>Lockhart v. Nelson</u>, 488 U.S. 33, 40-41, 109 S.Ct. 285, 291, 102 L.Ed.2d 265, 274 (1988).

In order to obtain convictions for the murders, the State had to prove, beyond a reasonable doubt, that the defendant knowingly or intentionally killed his wife and children. Ind. Code § 35-42-1-1(1). Sufficient evidence supported the jury's verdict.

The evidence at trial showed, among other things, that the defendant owned a handgun consistent with the type and caliber used to commit the murders—a Lorcin .38 caliber hammerless semi-automatic handgun. An inmate testified that the defendant told him that he had used a .38 caliber hammerless pistol that could not be traced to him to commit the murders. The defendant made inculpatory admissions to two other inmates. The State also presented blood spatter evidence consistent with a close-range attack and consisting of the wife's blood on the defendant's shirt and shoes. The defendant's clothing contained gunshot residue, brass and lead particles, biological tissue particles and contact stains of blood from the victims. Evidence, although erroneously admitted, placed the defendant at the home at the time of the murders. A reasonable jury could convict by crediting this evidence.

The defendant's counter-arguments—that Boney's involvement and his alibi evidence constituted reasonable doubt, that the evidence regarding the trace amounts of gun shot residue and brass shavings on his clothing was not probative, and that the State's jailhouse informants and experts were not trustworthy—merely urge this Court to accept his version of events over the version presented by the State. But it was the jury's job to determine whose evidence was more credible, and they chose the State's. It is not the appellate court's province to reweigh the

16

evidence, assess the credibility of witnesses, or substitute its judgment for the jury's. Drane, 867 N.E.2d at 146-47.

## 4. Other issues

Because we remand for new trial, we address the following issues raised by the defendant in this appeal, which are likely to resurface on retrial.

### (a) Evidence relating to Charles Boney

First, the defendant contends that the trial court committed reversible error when it allowed State witness Mala Singh Mattingly, Charles Boney's former girlfriend, to testify, over the defendant's hearsay objection, that a few hours before the murders Boney said to her "he was going to go help a buddy." Tr. 523 (w. 5, vol. III). The State takes the position that the trial court properly admitted the girlfriend's testimony under Rule 803(3) as a statement illustrating Boney's plan or intent to act. (The exception to the hearsay rule provided by Evid. R. 803(3) is discussed in the preceding section of this opinion.) On appeal, the defendant does not contend that her testimony was inadmissible under Rule 803(3), but argues instead that the admissibility of this testimony must be evaluated under Rule 801(d)(2)(E). Appellant's Br. at 33-34.

Evidence Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. The defendant's argument is that, because the State argued that he and Boney were coconspirators, the use of the girlfriend's testimony was subject to the requirements of Rule 801(d)(2)(E), one of which, he maintains, is that there be "independent evidence of a conspiracy prior to admission." Appellant's Br. at 34. We find it unnecessary to parse the defendant's Rule 801(d)(2)(E) argument because Rule 802, which provides that hearsay is "not admissible except as provided by law or by these rules," entitled the State to rely on the exception provided by Rule 803(3) here.

The defendant further argues that even if the statement was admissible under the hearsay rules, it was inadmissible under Rule 403 because its minimal probative value was substantially

17

outweighed by its prejudicial impact on his defense. We see no unfairness in the jury having the opportunity to weigh the girlfriend's testimony against the defendant's arguments that Boney acted alone. In addition, the defendant contends that the trial court improperly limited his ability to cross-examine her in certain respects, but we find that the trial court acted within its discretion in this regard.

The defendant also contends that the trial court improperly prevented him from presenting evidence that Boney was the perpetrator of the crimes charged in this case. While this Court is solicitous of a criminal defendant's right to present evidence that the charged crime was committed by another, that right is not without limits. *See* Joyner, 678 N.E.2d at 389-90.

At trial, the defendant unsuccessfully sought to introduce Boney's "four felony convictions for robbery in which women's shoes were the target and that [Boney had] an admitted foot fetish and shoe fetish," Tr. 738 (w. 3, vol. III), as evidence of Boney's (1) motive to commit the murders and (2) identity as the murderer. There was no evidence in this case that any robbery was perpetrated in connection with the killing of the wife, son, or daughter. There was, as discussed earlier, evidence suggesting that the daughter had been sexually molested at some point in time close to that of the killings. And while there was no evidence that the wife had been sexually assaulted in any way, when her body was discovered, her pants were pulled down, her shoes were off, and her feet were bruised.

We begin our inquiry as to the admissibility of Boney's criminal history and alleged foot and shoe fetish with Rule 404(b) and this Court's decision in Garland v. State, 788 N.E.2d 425 (Ind. 2003). In Garland, the defendant contended that testimony about a third party's prior bad acts was admissible for the same purpose advanced by the defendant here: to show the third party's identity as the perpetrator of the charged crime and motive to commit the crime. This Court held that "[i]f . . . evidence was probative on either of these [purposes], then it was admissible. If it was not, then the general policy of Rule 404(b) against character evidence would apply and the trial court was correct to exclude it." *Id.* at 430-31.

18

The prior crime of a third party must be "strikingly similar" to the current crime to be probative of identity. *Id.* at 431 (citing <u>Davis v. State</u>, 598 N.E.2d 1041, 1048 n.2 (Ind. 1993)). Specifically, the inquiry is whether the "crimes [are] so strikingly similar that one can say with reasonable certainty that one and the same person committed them?" <u>Davis</u>, 598 N.E.2d at 1048 n.2 (citing <u>Penley v. State</u>, 506 N.E.2d 806, 810 (Ind. 1987)). "Not only must the methodology of the two crimes be strikingly similar, but the method must be unique in ways which attribute the crimes to one person." <u>Penley</u>, 506 N.E.2d at 810. In <u>Garland</u>, this Court held that the evidence of the prior crime was not probative of identity. "[T]he crimes were not even the same. The [victim in the charged crime] was shot dead in his trailer, and [the prior crime was] intimidation in some other place and circumstance. That there were two threats [one in the charged crime and one in the prior crime] does not make [the victim's] killing a 'signature crime.'" <u>Garland</u>, 788 N.E.2d at 431. We additionally found that evidence of the prior crime was not probative as to the third party's motive because it did not "provide a potential reason" for the current crime. *Id.* And we concluded that "the trial court was correct to bar [prior crime] testimony." *Id.*

Here, as in <u>Garland</u>, Boney's prior crimes are not the same crimes as the charged crimes here, nor are they "strikingly similar." The few similarities, such as "targeting women . . . around their cars," and signs of a struggle between the assailant and the victim, do not make the murders of the defendant's family a "signature crime."

The defendant's claim that Boney's alleged foot and shoe fetish was the motive for these crimes fails because there is no evidence connecting these crimes to a foot or shoe fetish beyond the wife's shoes being off and her feet being bruised. In these circumstances, the defendant's contention is really that we should infer guilt on Boney's part because of his sexual compulsion for feet and shoes. This is the "forbidden inference" prohibited by Evidence Rule 404—that evidence of a person's character or character trait, such as crimes, wrongs, or acts, cannot be used to show action in conformity with that character or character trait—and by this Court's jurisprudence. Evidence regarding Boney's criminal history and alleged foot and shoe fetish was properly excluded under the Rules of Evidence.

The defendant briefly argues that even if Boney's criminal history and alleged foot and shoe fetish were not admissible under the Rules of Evidence, they nevertheless were required to be admitted as a matter of federal constitutional law under Holmes v. South Carolina, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

Holmes was a death penalty case in which the defendant offered evidence that a third-party had committed the murder. The evidence had been excluded at trial under a South Carolina evidence rule that prohibited a defendant from introducing evidence of third-party guilt if the prosecution had introduced forensic evidence that, if believed, strongly supported a guilty verdict. *Id.* at 329. The Supreme Court held that the application of this rule violated the defendant's right to have a meaningful opportunity to present a complete defense. *Id.* at 331. In explaining the Court's unanimous decision, Justice Alito wrote, "The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." *Id.*

We do not find Holmes controlling in our case. The evidence excluded in Holmes consisted of the testimony of several witnesses who placed the third-party in the victim's neighborhood on the morning of the assault, as well as other witnesses who testified that the third-party had either acknowledged that the defendant was "innocent" or had actually admitted to committing the crimes. *Id.* at 323. The evidence at issue in our case (Boney's prior criminal history) is obviously of an entirely different character; indeed, the jury was well aware that Boney was deeply implicated in these crimes. And the Court's opinion in Holmes is careful to say that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326. While the Court did not specifically mention Evidence Rule 404(b) in this regard (it did mention Federal Rule 403), we find its application here consistent with Holmes.

The defendant offers no other support for his claim of federal constitutional violation in this regard other than Holmes. We hold that the exclusion of Boney's prior criminal history did not violate the defendant's constitutional right to present a defense.

The defendant also challenges the trial court's exclusion of evidence of Boney's allegedly self-inculpating (1) statements to the defendant's investigator and (2) statement to a friend. Specifically, the defendant sought to introduce Boney's statement, in an answer to a series of hypothetical questions asked by the defendant's investigator, that if physical evidence of Boney's presence at the scene of the killings was found, it would be "pretty obvious" he was there and involved. Tr. 742-43 (w. 3, vol. III); Tr. 1280 (w. 7, vol. VI). And the defendant proffered the testimony of a friend of Boney's reporting that in a conversation that took place after the killings, Boney had allegedly said that "he had three bodies on his conscience, and that one more wouldn't matter." Tr. 209 (w. 7, vol. I).

The State argues that this evidence was simply not relevant and, therefore, not admissible. *See* Evid. R. 402 ("Evidence which is not relevant is not admissible."). The State's contention is that "this is not a case where the defendant sought to present evidence that an uncharged third-party actually committed the crime at issue." Br. of Appellee at 40. Boney had been charged with three counts of Murder and one count of Conspiracy to Commit Murder in a separate trial for his role in these crimes. *See* Boney, 880 N.E.2d at 286; *supra* note 1. Rather, the State points out, "it was undisputed that Boney was present at the scene and was a major participant in the murders," and the defense was that Boney committed the murders without the defendant's involvement, making the issue at trial whether the defendant acted in concert with Boney. Br. of Appellee at 40. None of this evidence, the State argues, is relevant to the issue of whether Boney acted alone.

The State's argument here is strong. But it could be argued that Boney's discussion, even in hypothetical terms, about the crimes without mentioning the defendant's presence contains some implication that the defendant was, in fact, not present. A slender possibility perhaps, but enough of one to decide this issue on a basis other than relevancy.

These statements also constitute hearsay—they are out-of-court statements by Boney offered to prove the truth of the matters asserted—and are therefore not admissible except as provided by law or our Rules of Evidence. Evid. R. 801(c), 802. The defendant contends that the

21

exception provided by Rule 804(b)(3), which provides an exception when the declarant is "unavailable as a witness," applies here because each of these statements "at the time of [their] making . . . so far tended to subject the [defendant] to . . . criminal liability, . . . that a reasonable person in the [declarant's] position would not have made the statement unless believing it to be true."

Neither party disputes Boney's unavailability as a witness at the defendant's second trial. We understand that, in light of his separate criminal trial, his unavailability was grounded in his privilege against self-incrimination. *See* Appellant's App'x at 712. Since then, of course, Boney has been convicted.

Our principal case on the applicability of the statement against interest exception to the hearsay rule is <u>Jervis v. State</u>, 679 N.E.2d 875 (Ind. 1997). In that case, as here, the defendant challenged the exclusion of hearsay testimony related to the possible involvement of others in the crime. The State contended that a statement against penal interest must be incriminating on its face to be admissible under this exception.[8] The defendant, by contrast, essentially argued that it was sufficient if the statement merely aroused some suspicion as to culpability in the factual context of the case. We agreed with the State that the trial court was within its discretion in rejecting this evidence. The statements attributed to the declarant "did not constitute an admission of a crime. In and of themselves they did not even 'tend to subject' [the declarant] to criminal liability. At most, they cast suspicion on [the declarant] when paired with other information that may or may not have been known to [the declarant]." *Id*. at 878.

We acknowledge that <u>Jervis</u> differs from this case in that Boney was clearly involved in the crimes charged here whereas it was unclear whether the declarant in <u>Jervis</u> was in any way involved. But the fact remains that there is nothing that Boney is alleged to have said to the defendant's investigator or to his friend that constituted "an admission of a crime" or "tended to

---

[8] In <u>Jervis</u>, the State also contended that the defendant had not established that the declarant was "unavailable," a requirement for admission under Evid. R. 804(b). <u>Jervis</u>, 679 N.E.2d at 878. Because of our resolution of this issue, it is not necessary for us to examine whether Boney was "unavailable" within the meaning of this rule.

subject [Boney] to criminal liability."  The exception to the hearsay rule provided by Evid. R. 804(b)(3) was not available here.

**(b) Opinion testimony from the State's bloodstain pattern experts**

The defendant also argues that the trial court committed reversible error when it allowed opinion testimony from the State's bloodstain pattern experts.

Following the killings, the State collected the defendant's blood-stained shirt, shoe, and socks.  The State used expert testimony to try to establish that some of the bloodstains were the result of "high velocity impact spatter," indicating that the defendant shot his family or was within close proximity of the victims when they were shot.  (The defendant maintained that the bloodstains were solely the result of "transfer"—his shirt, shoe, and socks having come into contact with the victims' bodies when he discovered them and the blood having been transferred to his clothing through the contact.)  It is worth noting in this "spatter" versus "transfer" debate that the State contends that some of the blood on the defendant's clothing came from spatter and some of it from transfer; the defendant maintains that all of it was from transfer.  On appeal, the defendant contends that the experts' testimony did not meet the standards of reliability required by Indiana law.  He also argues that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice.

Evidence Rule 702(b) dictates that "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable."  Here, both sides agree as a general matter that bloodstain analysis is a matter for expert scientific testimony, as this Court has recognized.  Grinstead v. State, 684 N.E.2d 482, 487 (Ind. 1997), *superseded on unrelated grounds at* 845 N.E.2d 1027 (Ind. 2006).  But the defendant maintains that the science of bloodstain analysis has not advanced to the point of reliability in this particular case.

Before trial, the court conducted a hearing on this matter.  The State's stance was that the reliability of the scientific principles upon which bloodstain analysis expert testimony is based is

well established. It cited a number of Indiana cases, including Grinstead, and those in other jurisdictions, in which bloodstain analysis expert testimony was held to have been properly admitted. It also noted that, "It should be unnecessary to revisit scientific techniques already deemed to have achieved sufficient general acceptance."[9] Robert L. Miller, Jr., Courtroom Handbook on Indiana Evidence 236 (West 2007-08). The defendant did not dispute this position at the hearing but instead contended that the facts of this case were such that this authority was not applicable. He contended that the bloodstains on his clothing consisted of "eight tiny [blood] stains on a man's t-shirt," Appellant's Br. at 38, and that the science of bloodstain analysis was simply not sufficiently advanced to be capable of discerning whether such a small number of tiny blood spots came from high-velocity impact spatter or from physical contact. At the end of the hearing, the trial court ruled in the State's favor and found that the "blood pattern stain analysis evidence is admissible in this case, such that the witnesses qualified as experts by knowledge, skill, experience, training or education, may testify in the form of an opinion or otherwise." Appellant's App'x at 624.

At trial, the State presented bloodstain analysis testimony from five purported experts. The defendant objected to the qualifications of one of these experts; the other four testified without any objection to their qualifications as experts. Each witness testified that some of the bloodstains on the defendant's shirt were the result of high-velocity impact spatter. *See* Tr. 633-35, 637 (w. 2, vol. III); Tr. 622-23, 703 (w. 4, vol. III); Tr. 101-03, 221-23 (w. 5, v. I). The defendant did object to some, but not all, of these witnesses' testimony as contrary to Rule "702," which we take to be an objection to the reliability of the scientific principles on which it was based. After the State rested, the defendant called four bloodstain analysis expert witnesses of his own. Each of these witnesses testified that all of the bloodstains on the defendant's shirt resulted from transfer, not high-velocity impact spatter. *See* Tr. 512, 522-23, 526, 528, 681 (w. 6, v. III); Tr. 447, 450 (w. 7, vol. II); Tr. 779-80, 865-66 (w. 7, vol. IV).

---

[9] Judge Miller's Courtroom Handbook points out that before adoption of the Indiana Rules of Evidence, this Court "recognized the admissibility, based on reliability, of expert testimony concerning the results of . . . blood splatter analysis" in James v. State, 613 N.E.2d 15, 21 (Ind. 1993). Robert L. Miller, Jr., Courtroom Handbook on Indiana Evidence 236 (West 2007-08). We reaffirmed this holding after the adoption of the Rules in Grinstead, 684 N.E.2d at 487.

We find significant that the defendant's own experts, without exception, believed themselves to be qualified and capable of rendering an opinion as to the source of the bloodstains in this case. We do not discount the defendant's general point that simply because scientific principles have been found to be reliable in certain cases, they will not necessarily be able to be applied in all situations. But here, the defendant has not provided any authority that bloodstain analysis scientific principles cannot be relied upon in this particular circumstance and, indeed, his own experts did so. We also think the existence of conflicting expert testimony on this issue helps resolve the claim that the probative value of the State's witnesses' testimony was outweighed by its prejudicial effect. While this was certainly strong evidence in the State's favor, it appears to have been refuted head-on by strong expert testimony in favor of the defendant's position. This was a classic battle of the experts that was properly submitted to the jury for resolution.

**(c) Courtroom demonstration by the State's expert witness**

The defendant also contends that the trial court committed reversible error when it allowed one of the State's expert witnesses, Mr. Englert, to conduct a courtroom demonstration. The State responds that "[d]emonstrations are permitted to be conducted during a trial if they will aid the court and the jury." Br. of Appellee at 37. It further maintains that Englert's demonstration "aided the jury in understanding his testimony regarding crime scene reconstruction, bloodstain analysis, and the possible trajectory of the bullets." *Id.* at 38.

At trial, Englert, the State's expert on crime scene reconstruction, used a configuration of chairs representing the front and back seats of the defendant's vehicle to demonstrate his crime scene analysis. His demonstration included maneuvering among the chairs, re-enacting the shootings while doing so. And he used the demonstration to express his opinion as to how some of the daughter's blood and tissue had arrived on the defendant's shirt. The State offered these demonstrations to illustrate to the jury "where people were situated and as to where the shots came from, what side, his general principles as to his crime scene reconstruction." Tr. 734 (w. 4, vol. III).

25

Before the jury observed the demonstrations, the defendant objected on grounds that they would be misleading, an undue waste of time, and a discovery violation. *Id.* at 733-34. The trial court overruled the objections "to the extent that for demonstrative purposes only the witness may be questioned as to, for example, placement of persons within the vehicle in rendering his opinion as to what may have occurred at the time of the incident." *Id.* at 734-35. The trial judge specifically noted that he did not foresee the demonstration to be a reenactment of the crime. *Id.* at 735. During the actual demonstration, defense counsel did make one contemporaneous trial objection based on "speculation." Tr. 769 (w. 4, vol. IV).

On appeal, the defendant reasserts three of his trial objections: first, that Englert's opinion concerning how certain of the daughter's blood and tissue had been transferred to his shirt constituted an "enhanced opinion" that the State had never disclosed to the defense, thereby constituting a discovery violation, Appellant's Br. at 43; second, that the configuration of the chairs and the reenactment were misleading because they were "conducted under conditions dissimilar to the crime scene," *id.* at 44-45; and third, that "Englert's opinion and re-enactment of [the son's] murder were based on speculation" because his testimony was supported only by ambiguous evidence, *id.* at 43 (citing Evid. R. 703).

As to the discovery violation claim, Trial Rule 26(E)(1) requires parties to supplement discovery responses with respect to the subject-matter and substance of an expert witness's expected testimony in a timely fashion. And pre-trial standing discovery orders often impose related requirements. As such, there are situations in which the unexpected testimony of an expert witness can rise to the level of reversible error. For example, in <u>Beauchamp v. State</u>, the Court of Appeals held that it was reversible error for the State not to have disclosed that one of its expert witnesses had changed his opinion regarding the cause of a victim's injuries from the time of his deposition to his testimony at trial. 788 N.E.2d 881, 893-94 (Ind. Ct. App. 2003). And in its opinion in this defendant's first appeal, the Court of Appeals found that the State's failure to disclose another State witness's "augmented" opinion did not comply with either the trial court's standing discovery order or Rule 26(E)(1).[10] 812 N.E.2d at 1141.

---

[10] Given its disposition of the case, the court did not reach the question of "whether this violation . . . independently would have warranted reversal of [the defendant's] conviction." 812 N.E.2d at 1141.

During Englert's pre-trial deposition, he had testified about the particular blood stains and tissue in question—the daughter's blood and tissue on the defendant's shirt—and said that in his opinion, they were the result of transfer as opposed to splatter. And while it is true that in the demonstration at trial, he went beyond his deposition testimony and expressed his view that the transfer occurred during the shooting, this does not rise to the level of a discovery violation. The trial court's only requirement of the parties regarding discovery of expert witnesses said, "The parties are directed to generally disclose to one another the anticipated witnesses to be called to testify the following week." Appellant's App'x at 735. The defendant knew Englert would testify, thus satisfying the trial court's requirement. To be sure, Trial Rule 26(E)(1) requires parties to supplement discovery responses with respect to the subject-matter and substance of an expert witness's expected testimony in a timely fashion. *See* Beauchamp, 788 N.E.2d at 894. But the defense knew before trial that it was Englert's opinion that the blood and tissue in question was the daughter's and that it was on the defendant's shirt by transfer. As it was the State's theory that the defendant was the shooter, it could not have been a surprise when Englert expressed his view that the transfer occurred during the shooting.

As to the generalized claim that the demonstration was misleading, a trial court's decision to allow courtroom demonstrations will only be reversed for an abuse of discretion. Lambert v. State, 643 N.E.2d 349, 353 (Ind. 1994). This is in part because "[d]emonstrations are permitted to be conducted during a trial if they will aid the court and the jury." Benner v. State, 580 N.E.2d 210, 213 (Ind. 1991). Here we see no basis for concluding that the trial court abused its discretion by allowing the demonstrations. Indeed, the demonstration appears to have helped the jury and the court gain a sense of perspective during Englert's testimony that also used close-up pictures of the crime scene and gunshot trajectory analysis. And contrary to the defendant's contention, we disagree that the un-scaled chair configuration misled the jury, as the jury had seen the vehicle itself and photographs of its interior. Tr. 733 (w. 4, vol. III).

The defendant's final contention that "Englert's opinion and re-enactment of [the son's] murder were based on speculation," Appellant's Br. at 43, goes to the weight of the testimony, and not to its admissibility. It was the jury's responsibility to consider the evidence and to decide

the weight to give to Englert's demonstration and opinion. The trial court did not err in permitting the Englert demonstration and opinion.

## Conclusion

We reverse the defendant's convictions and remand for new trial or other proceedings consistent with this opinion.

Sullivan, Boehm, and Rucker, JJ., concur. Shepard, C.J., dissents with separate opinion.

**SHEPARD, Chief Justice, dissenting.**

The system of justice seeks to provide a fair trial, but there is no entitlement to a perfect trial. I think the two reversals entered by the appellate courts in this case have unnecessarily sanitized the evidence against David Camm.

Amidst the mountainous evidence in this trial was Camm's declaration while in prison that his wife intended to leave him because of problems in their marriage and that he planned the killings on a night when the basketball game might provide an alibi. The credibility of this jailhouse testimony (which included more direct admissions of guilt) might have been easier for the jury to assess had it known that David Camm was a serial adulterer whose activity recruiting sex partners persisted as late as ten days before the murders and continued through his pre-trial incarceration when he solicited a female guard at the jail.

The reversal after trial number one may have legitimately rested in part on the prosecution's use of twelve women to tell the stories of Camm's infidelity running back as far as nine years before these murders. The testimony about how Camm treated his wife during periods up closer to the killings seems probative of motive, but it does not surprise me that the prosecutors decided in trial number two not to run the risk of seeking to let the jury hear it.

I put in the same category this Court's tough stance of prohibiting any of the evidence that Camm's daughter had been molested within a day or two of the murders, evidence the prosecution has suggested indicated Camm killed the family so as to avoid responsibility or confrontation. After the first trial, the Court of Appeals summarized the available evidence on the topic this way:

> The medical examiner who conducted Jill's autopsy testified that there was trauma to her genital region consistent with either molestation or a straddle fall; there was no penetration of the hymen, however. The State also presented evidence that Jill had complained of vaginal irritation on at least two prior occasions, the last time being a few days before the murders. Finally, it presented evidence that some of Jill's DNA was found on Camm's bedspread, which could have come from saliva or vaginal secretions. However, none of Jill's DNA was found in the

> two locations where seminal material from Camm was also found on the bed-spread. In fact, at one of those locations Camm's seminal material was mixed with Kim's DNA.

Camm, 812 N.E.2d at 1140. The defense lawyers who have been so effective as to win two reversals did not even bother to object to this evidence during trial number one. I regard this evidence as providing an inference about Camm's motive and dissent from today's decision to bar the jury from hearing it.

Finally on admission of evidence, the Court reverses because the witness quoted Kim Camm as saying, "she was expecting her husband home between 7:00 and 7:30 . . . , " citing Evidence Rule 803(3). The Court suggests that it might permit a witness to quote a victim as saying, "I plan to be home between 7:00 and 7:30." This suggested distinction appears to indicate that a reversal would be required if instead the victim had told her friend, "I plan to be home between 7:00 and 7:30 so I can meet my husband." The Court has cut a pretty fine line today on what is permitted and what is prohibited under Rule 803(3). I do not see so large a space of daylight here as my colleagues do. It is not the stuff upon which reversals are warranted.

Part of the reason I regard reversal as unwarranted is the rest of the evidence the jury heard. The Court passes over in two sentences Camm's confessions of guilt to three different inmates. Twenty-four jurors apparently credited their testimony.

But, one may put those witnesses aside and ask instead what the jury made of Camm's own version of the events.

Camm says he came home to a horrific scene, concluded his son was warm and might still be saved, decided to go inside the house, called a distant police agency, turned down three suggestions that medical help be sent, and only then went back to the garage to administer CPR. Or ask what the jury probably made of Camm's phone call at 7:15 a.m. the morning after the murder to inquire at Kim's work about her employment benefits. Or his request that very same day that an acquaintance who was in the crime scene cleaning business come to clean out the vehicle that contained evidence about the murders.

I would affirm the jury's verdict.