## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 23 2016, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William L. Howard,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | May 23, 2016<br><br>Court of Appeals Case No.<br>92A03-1504-CR-129<br><br>Appeal from the Whitley Superior Court<br><br>The Honorable Douglas M. Fahl, Judge<br><br>Trial Court Cause No.<br>92D01-1406-FD-309 |

**Brown, Judge.**

[1] William L. Howard appeals his conviction for possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine as a class D felony. He raises two issues which we revise and restate as:

    I.    Whether the trial court abused its discretion by admitting certain evidence; and

    II.    Whether the evidence is sufficient to sustain his conviction.

We affirm.

## *Facts and Procedural History*

[2] Howard struggled with alcohol and resided at Thirteen Steps halfway house where he met Robert Jennings, who also resided there for a time under the supervision of the Allen County drug court for manufacturing methamphetamine. Howard was self-employed, working part-time scrapping metal. Howard and Jennings worked together on a roofing project through Thirteen Steps, where Howard noticed that Jennings was a hard worker, and he offered Jennings a job scrapping metal.

[3] The two worked together scrapping metal about four or five times over a period of a month and a half. On the morning of June 13, 2014, the two met at the scrap metal site that Howard was clearing. They left the job site to purchase gas, cigarettes, drinks, and to run a few errands in Columbia City. Howard was driving his sister's vehicle, which he had "traded for," but the title was still in his sister's name and he did not yet have the title in his possession. Transcript at 299. While Howard was driving, Jennings requested that they make a stop at

ACE Hardware in Columbia City, and Jennings entered the store and purchased a bottle of lye.

[4] An ACE Hardware employee contacted Detective William Brice of the Whitley County Sheriff's Office to report the purchase. Lye is a precursor used in manufacturing methamphetamine, and ACE Hardware participated in Whitley County's Meth Watch program which involved training by the Whitley County Sheriff's Department to raise awareness about items that could be used in manufacturing methamphetamine. ACE Hardware employees in Whitley County had previously contacted area law enforcement regarding suspicious purchases. The employee stated to Detective Brice that a man, later identified as Jennings, purchased lye while another man, later identified as Howard, waited in the vehicle. The employee also provided Detective Brice with a description of the vehicle.

[5] After Detective Brice received the employee's report, he drove towards the ACE Hardware, observed the vehicle, and began following it. Detective Brice noticed that the vehicle "went a long way out of the way," and appeared to make "a big circle or big loop" before arriving at its eventual destination, Walmart. *Id.* at 146-147. When they arrived, Jennings entered the Walmart, purchased drain opener and lighter fluid, and returned to the vehicle. Howard then entered the Walmart and at Jennings's request purchased "Wal-fed," a generic form of pseudoephedrine, and returned to the vehicle. *Id.* at 182. As Howard left the store and was returning to the vehicle, Jennings went back inside the Walmart but did not purchase anything. At that point, Detective

Brice, who had been observing the two men, became aware that Howard and Jennings had at least two precursors, lye and pseudoephedrine, and requested that other law enforcement officers initiate a traffic stop when the vehicle drove away. When Jennings returned to the vehicle, the two men sat in the parking lot for a short time before driving away.

[6] Meanwhile, Detective Brice ran the vehicle's license plate and observed that the plate belonged to Howard but was not registered to the vehicle, which raised "another red flag." *Id.* at 150. Deputy Scott Schmitt initiated a traffic stop, which was recorded on his dashboard camera, approached the vehicle and inquired as to why the license plate did not match the plate listed for the vehicle, and Howard told him that his sister had recently purchased the vehicle and that he had placed his license plate on it. Deputy Schmitt asked Howard to step out of the vehicle, and when asked if he knew what precursors are, Howard responded affirmatively. Detective Brice arrived at the scene and spoke with Howard about conducting a search of the vehicle, and read him a *Pirtle*[1] warning. Because the vehicle belonged to his sister, Howard asked Detective Brice if he could consent, and Detective Brice told him that he could. Howard asked what would happen if he did not consent, and Detective Brice stated that he would seek a search warrant. Howard consented to the search and again stated to Detective Brice that he knew what precursors are.

---

[1] *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975).

[7]     Detective Brice and two other officers then proceeded to search the vehicle, which revealed a one-pound jar of sodium hydroxide, liquid lightening drain opener, which contained hydrochloric acid, and two eight-fluid-ounce bottles of lighter fluid. The officers also discovered receipts, dated June 13, 2014, for the items purchased from ACE Hardware and Walmart, as well as a cooler containing beer and plastic bottles. Fifteen tablets of pseudoephedrine were found in Jennings's pockets. Detective Brice observed that ammonium nitrate, salt, and lithium were the only items missing for the two men to be able to manufacture methamphetamine, and he indicated that he was not aware of any other purpose for which the items found at the search could be used collectively.

[8]     Detective Brice arrested both men and took them to the Whitley County jail where both were interviewed. During Howard's interview he told Detective Brice that, after Jennings first entered the Walmart, he returned to the vehicle and asked Howard if he would buy a "box of Wal-fed" which Howard purchased for Jennings, and when Howard returned to the vehicle, Jennings began "busting the pills out." *Id.* at 182, 185. Jennings removed fifteen pills from the package, which were recovered on Jennings's person, but the package itself was not found.

[9]     On June 16, 2014, the State charged Howard with Count I, possession of two or more chemical reagents or precursors with the intent to manufacture methamphetamine as a class D felony, and Count II, maintaining a common

nuisance as a class D felony.[2]  At a hearing on March 2, 2015, the State sought to dismiss Count II, and the court granted the State's motion.

[10]  A two-day jury trial began on March 4, 2015.  The State offered into evidence the video recording of Howard's interview with Detective Brice.  Howard's counsel objected, stating, "I would have no[] objection to the, to the interview it's self [sic] judge, although there are portions which are at issue."  *Id.* at 174.  The court played the exhibit to the jury, and in the course of the interview Howard indicated that he had not had any prior drug charges, that he had "never used Meth," and he acknowledged that he used marijuana "[e]very once in a while" for back pain.  *Id.* at 187.  While the State was playing Howard's interview with Detective Brice, Howard's counsel requested a sidebar but did not contemporaneously object when Howard first acknowledged using marijuana.  At the sidebar the following exchanged occurred[3]:

> [Howard's Counsel]: I believe[] the State might try to introduce the portion of the videotaped statement in which Howard indicated he smoked marijuana, despite his earlier objection to the presentation of such evidence.  I'm going to object to that.

---

[2] On the same day, Howard also received a complaint and summons for lacking a valid motor vehicle license as a class C infraction as well as for operating a motor vehicle with a fictitious registration number as a class C infraction.

[3] In an order granting Howard's motion to stay, file-stamped August 28, 2015 and entered in this Court's docket on August 31, 2015, this Court ordered Howard to file a Statement of Evidence pursuant to Appellate Rule 31(A).  The trial court certified Howard's Statement of Evidence on October 27, 2015.  Where Howard's Statement of Evidence contains material supplementing inaudible or unintelligible portions of the transcript, citation will be made to both the transcript and the Statement of Evidence.

[Prosecutor]: He's going to testify (inaudible) he's told the jury in a little bit that he's going to testify. I think I should be allowed to explore anything that has to do with his memory and his ability to recollect events. So I think I can play it. It is uncharged misconduct but not for purposes of proving character (unintelligible).

[Howard's Counsel]: But the problem is that he doesn't just say I smoked that day. It's a disclosure that I do it all the time. And I think it is prejudicial.

[The Court]: [W]hat I'm going to do [is] allow admission of the evidence of Howard's statement that he had smoked marijuana for purposes of showing Howard's state of mind but not for purposes of challenging his character.

Transcript at 191; Appellant's Appendix at 156. The State then recalled Detective Brice for further questioning.

[11] On cross-examination of Detective Brice, the following exchange occurred:

Q: Wouldn't you agree that [Howard] appeared to be pretty calm? At that point in time?

A: I, don't know how to answer that. I mean, he wasn't out of control. If that's, he seemed very nervous to me. But that's, that's my impression.

Q: And would that be something we would have seen on the video?

A: Yes.

\* \* \* \* \*

Q: So you guys ended up, you went back to the Sheriff's
Department and he did engage with you and give a voluntary
statement?

A: Yes.

Q: And you also interviewed Mr. Jennings?

A: Yes.

\* \* \* \* \*

Q: Did Mr. Jennings appear to you to be nervous, either at the
scene of the arrest or in the jail as your statement?

A: I didn't have much contact with him at the scene. Um, and
I'd have to answer yes of, he seemed nervous when I was
interviewing him.

Q: Would it be fair to say (unintelligible)?

A. I don't recall. But yes. I would say, in my mind he seemed
nervous and that's one of the things that I think of as nervous.

\* \* \* \* \*

Q: I guess what I'm asking you detective is if you could expand
a little bit on what you said that, he did appear to be in your
mind to some degree acting nervous? Can, can you describe
what you saw that would bring you to that conclusion?

A: I have a lot of opportunity to interview a lot of people in my job and a lot of people that are using drugs especially Methamphetamine and in questioning Mr. Jennings in our interview. He just seemed to be, I've got precursors in the vehicle, and I've got two people. One of them did it? Or two of them did it. I don't know which. I'm trying to get to the bottom of it. So when I'm asking pointed questions, people seem to get nervous and shuffle in there [sic] seat a little bit. And I noticed that with Mr. Jennings.

Q: I really only have a couple other questions for you detective. Based on your, what you have personally witnessed yourself, your own personal knowledge, it, the only thing that you, you found these items here and I understand it, but did you ever witness [Howard] be in possession or purchase any of these items, other than the pseudoephed, did you see him purchase these other items that were in question?

A: No. Just the pseduoephed.

Transcript at 207-210.

[12] During the State's redirect examination of Detective Brice, the prosecutor requested a sidebar, and the following exchange occurred:

[Prosecutor]: The last thing, I think, the last thing that I want to get into, [Howard's Counsel] brought it up, on (unintelligible), I think it's a fair game now for me is he compared and contrasted Jennings' nervousness with Howard's calmness. I want to ask about the marijuana, if (unintelligible) for his demeanor. Because [Howard's Counsel] used that as a way to say, my guy's calm. He's innocent, this guy's guilty. He's (unintelligible). He's nervous. He's used that. So, in my idea judge he's opened the door to whether or not there was some evident [sic] behind that calmness.

[Howard's Counsel]: [T]he prejudicial impact of introduction of Howard's drug usage exceed[s] its probative value. [T]his [is] a drug case and [] exposing the jury to Howard's admission to illegal drug use would prejudice the jury against him.

[Prosecutor]: I agree. He did not. (Unintelligible) Jennings, on Jennings point of view, made specific reference with the fact that Howard was calm, very calm. And the evidence from the video is that he had smoked marijuana, (unintelligible) prior to this event.

[Howard's Counsel]: (Unintelligible).

Court: Okay. Okay. I'm going to let (unintelligible) that he did point out the nervousness, talked about that and the use of marijuana can contribute to that, calmness, so, uh the portion of Howard's videotaped statement to police in which he admitted smoking marijuana but only for the limited purpose of explaining Howard's alleged calmness after his arrest. Okay.

Transcript at 212; Appellant's Appendix at 157. Following the sidebar, and on the State's redirect, the following exchange occurred:

Q: Detective, [Howard's Counsel] asked you several questions about, or compared for a lack of better term, Mr. Jennings['s] demeanor with that of the defendant. And I believe you testified that Mr. Jennings appeared nervous and fidgety. Is that right?

A: Yes.

Q: In the interview?

A: Yes.

Q: Okay. And that, and that, and that contrast Mr. Howard appeared to somewhat calmer in the interview. Is that fair to say?

A: In the interview, yes.

Q: Okay. Um and during the course of that interview specifically to his level of calmness, did you ask him later in that interview whether there was, whether he had, had anything that day? Whether he consumed anything that day?

A: Yes I did. Yes I believe [he] did.

Q: And what was that?

A: I think he used marijuana that day.

Q: That was the defendant's statement to you?

A: Yes.

Transcript at 212-213.

[13]  Jennings testified that he did not tell Howard that he had purchased lye at ACE Hardware, that he did not show Howard the lye he purchased, that he tried to hide it from Howard when he returned to the vehicle, and that after leaving ACE Hardware Howard "just drove to Wal-Mart" *Id.* at 234. Jennings stated that he went into Walmart and purchased drain opener and lighter fluid and indicated that he did not tell or show Howard what he bought, and he then asked Howard to buy him some "Claritin." *Id.* at 238. He further testified that

when Howard called him to tell him that Walmart did not have the brand Jennings requested, he walked back into the store and "felt kind of nervous" but he was also "kind of excited" because he thought he had acquired the items he needed to manufacture methamphetamine. *Id.* at 240. Jennings indicated that it was his intention to make methamphetamine for himself, and that he did not plan to sell it. He further stated that he did not discuss with Howard prior to their purchasing the items that he was planning to manufacture methamphetamine and that he took full responsibility for the items found in Howard's vehicle. Jennings also acknowledged that during his interview with Detective Brice he initially blamed Howard, and that, during his guilty plea, he pled guilty to possession of precursors with the intent to manufacture methamphetamine with Howard.

[14] Howard testified that he studied "extensively" about chemicals in a vocational course in horticulture he completed at Rhend Lake Community College. *Id.* at 272. He stated that he had never been to ACE Hardware or Walmart prior to the date he was arrested, and that he was not familiar with the route to go from ACE Hardware to Walmart. He acknowledged that he was aware Jennings was drug tested while at Thirteen Steps and that Jennings's drug of choice was methamphetamine, but he did not specifically know why Jennings was in drug court. He testified that he was on the phone when Jennings went into ACE Hardware, that he did not see what was in the bag when Jennings returned to the vehicle, but that it "looked like a bottle" and he "didn't know what it was." *Id.* at 288. He indicated that Jennings did not tell him what he was buying or

doing at Walmart, that Jennings returned with a bag, that he did not see what was in the bag, that Jennings placed the bag behind the seat on the passenger side, and that Jennings asked him to pick up some "cold pills," specifically, "Wal-fed." *Id.* at 294-295.

The jury found Howard guilty of possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine. The court sentenced him to two years imprisonment with 284 days credit for time served, consecutive to any sentence he received on pending federal charges.

## *Discussion*

### I.

The first issue is whether the trial court abused its discretion when it admitted certain evidence of Howard's marijuana use on the day of the offense. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied.* We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied.* We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Errors in the admission of evidence are to be disregarded unless they affect the defendant's substantial rights. *Id.* at 1059. In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact-finder. *Id.* The improper admission is harmless error

if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* Failure to timely object to the erroneous admission of evidence at trial will procedurally foreclose the raising of such error on appeal unless the admission constitutes fundamental error. *Stephenson v. State*, 29 N.E.2d 111, 118 (Ind. 2015).

[17] Howard argues that the trial court abused its discretion by admitting evidence of his statement to Detective Brice that he had used marijuana on the day of the alleged offense, and that evidence of his statement regarding his marijuana use was inadmissible under Indiana Evidence Rule 404(b). He further argues that he did not open the door to evidence of his marijuana use, and, even if it was admissible under Indiana Evidence Rule 404(b), the statement would be inadmissible because its probative value was substantially outweighed by the risk of unfair prejudice.

[18] The State argues that Howard "opened the door" on cross-examination when he "attempted to compare and contrast his own alleged calmness with Jennings's alleged nervousness during their interactions with law enforcement." Appellee's Brief at 14-15. Alternatively, the State argues that the admission of Howard's marijuana use was harmless error, noting that the jury was already aware of his marijuana use and that independent evidence of his guilt existed.

[19] Indiana Rule of Evidence 404(b) constrains the admission of evidence of uncharged misconduct and provides:

Crimes, Wrongs, or Other Acts.

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities." *Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997). In determining whether to admit evidence of specific acts under the rule, the trial court is to: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; (2) determine that the proponent has sufficient proof that the person who allegedly committed the act did, in fact, commit the act; and (3) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009), *reh'g denied*. Additionally, otherwise inadmissible evidence may become admissible where the defendant "opens the door" to questioning on that evidence. *Jackson v. State*, 728 N.E.2d 147, 152 (Ind. 2000). However, "the evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Id.*

[20]  Here, we need not decide whether the trial court abused its discretion in admitting the portion of Detective Brice's testimony challenged by Howard because any error in the admission of evidence concerning Howard's marijuana use was harmless. The jury previously heard Howard acknowledge in his interview with Detective Brice that he had used marijuana, "[e]very once in a while" for back pain. Transcript at 187. Howard did not contemporaneously or specifically object when his previous use of marijuana was initially mentioned, does not argue on appeal that the admission of evidence constituted fundamental error, and his arguments on appeal merely concern his subsequent objections to the admission of his use of marijuana on the day of the offense.[4] Further, as set forth in part II below, there was substantial evidence in the record of Howard's guilt to support his conviction, and the probable impact on the jury of his marijuana use on the day of the offense was sufficiently minor so as not to affect his substantial rights. Accordingly, we conclude that any error was at worst harmless error. *See Ortiz v. State*, 741 N.E.2d 1203, 1208 (Ind. Ct. App. 2001) (holding that the admission of evidence of defendant's prior bad acts was harmless error where defendant's conviction was supported by substantial independent evidence of guilt); *Daniels v. State*, 683 N.E.2d 557, 559 (Ind. 1997) (explaining that the admission of otherwise prejudicial evidence was

---

[4] We observe that Howard's statement that he used marijuana "[e]very once in a while" appears on page 187 of the transcript, and he did not object until page 191 when his counsel stated, "I believe[] the State might try to introduce the portion of the videotaped statement in which Howard indicated he smoked marijuana, despite his earlier objection to the presentation of such evidence. I'm going to object to that." Transcript at 187, 191; Appellant's Appendix at 156. To the extent he references a prior objection in the statement of evidence, he does not point to the prior objection in the record.

"harmless in light of the other evidence clearly establishing the defendant's guilt").

## II.

The next issue is whether the evidence is sufficient to sustain Howard's conviction for possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine as a class D felony. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Jordan v. State*, 656 N.E.2d 816, 817 (Ind. 1995), *reh'g denied.* Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

The offense of possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine as a class D felony is governed by Ind. Code § 35-48-4-14.5(e), which at the time of the offense, provided that "[a] person who possesses two (2) or more chemical reagents or precursors with the intent to manufacture a controlled substance commits a Class D felony." (Subsequently amended by Pub. L. No. 158-2013, § 643 (eff. July 1, 2014); Pub. L. No. 168-2014, § 105 (eff. July 1, 2014)). The charging information provided that Howard "did knowingly possess two (2) or more chemical reagents or precursors with the intent to manufacture Methamphetamine, a schedule II controlled substance." Appellant's Appendix at 22. Thus, the State was

required to prove that Howard (1) knowingly; (2) possessed two or more chemical reagents or precursors; and (3) that he had the intent to manufacture methamphetamine.

[23] It is well-established that possession of an item may be either actual or constructive. *See Lampkins v. State*, 682 N.E.2d 1268, 1275 (Ind. 1997), *modified on reh'g*, 685 N.E.2d 698 (Ind. 1997). Constructive possession occurs when a person has: (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it. *Id.* The capability element of constructive possession is met when the State shows that the defendant is able to reduce the contraband to the defendant's personal possession. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). Additionally, "[a] trier of fact may infer that a defendant had the capability to maintain dominion and control over contraband from the simple fact that the defendant had a possessory interest in the premises on which an officer found the item." *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). *See also Goliday*, 708 N.E.2d at 6 (explaining that "[p]roof of a possessory interest in the premises in which the illegal drugs are found is adequate to show the capability to maintain control and dominion over the items in question") (quoting *Davenport v. State*, 464 N.E.2d 1302, 1307 (Ind. 1984), *cert. denied*, 469 U.S. 1043, 105 S. Ct. 529 (1984)).

[24] The intent element of constructive possession is shown if the State demonstrates the defendant's knowledge of the presence of the contraband. *Goliday*, 708 N.E.2d at 6. A defendant's knowledge may be inferred from either the

exclusive dominion and control over the premises containing the contraband, or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of contraband. *Id.* These additional circumstances may include: "(1) a defendant's incriminating statements; (2) a defendant's attempting to leave or making furtive gestures; (3) the location of contraband[-]like drugs in settings suggesting manufacturing; (4) the item's proximity to the defendant; (5) the location of contraband within the defendant's plain view; and (6) the mingling of contraband with other items the defendant owns." *Gray*, 957 N.E.2d at 175. The State is not required to prove all additional circumstances when showing that a defendant had the intent to maintain dominion and control over contraband. *See Gee v. State*, 810 N.E.2d 338, 344 (Ind. 2004) (explaining that the additional circumstances "are not exclusive" and that "the State is required to show that whatever factor or set of factors it relies upon in support of the intent prong of constructive possession, those factors or set of factors must demonstrate the probability that the defendant was aware of the presence of the contraband and its illegal character").

[25] Howard acknowledges that the State produced evidence of lye drain cleaner containing sodium hydroxide; liquid lightening drain opener containing hydrochloric acid; two eight-ounce containers of lighter fluid, a solvent; and pseudoephedrine tablets; but asserts that it failed to prove that he had "the intent and capability to maintain dominion and control" over the precursors found during the search and on Jennings's person. Appellant's Brief at 20. He

maintains that the precursors were not within his control in the vehicle, that he lacked knowledge of the presence of precursors other than the pseudoephedrine tablets, that Jennings testified he used deception to acquire the precursors and Howard was unaware of Jennings's intent to manufacture methamphetamine, and that Jennings testified that it was his intent alone, not shared with Howard, to manufacture methamphetamine.

[26] The State argues the evidence is sufficient to sustain Howard's conviction and notes that Howard conceded that the vehicle contained lye, lighter fluid, drain opener, and pseudoephedrine. It argues Howard constructively possessed the precursors, noting that they were found in the vehicle he was driving, that he knew pseudoephedrine was a precursor, and that the precursors were all found in close proximity to him and that his arguments on appeal are a request for this Court to reweigh the evidence.

[27] The facts most favorable to the conviction show that Howard, though lacking physical possession of the vehicle's title, was the driver of the vehicle and had a possessory interest in it, and that lye drain cleaner, which contained sodium hydroxide; liquid lightening drain opener, which contained hydrochloric acid; two eight-ounce containers of lighter fluid, which is a solvent; and pseudoephedrine tablets, were all found in the vehicle. Howard's possessory interest in the vehicle demonstrates his capability to maintain dominion and control over the contraband therein. As he was not in exclusive possession of the vehicle at the time of the offense, we must look to evidence of additional circumstances pointing to his knowledge of the presence of contraband. The

record reveals that Howard drove Jennings to ACE Hardware where Jennings purchased a bottle of lye, Howard testified that he observed Jennings with what "looked like a bottle", and they then drove "a long way out of the way" and appeared to make "a big circle or big loop" before driving to Walmart, where Jennings first entered the store and purchased drain opener and lighter fluid. Transcript at 288, 146-147. Howard then entered the store and purchased cold medicine, which contains pseudoephedrine, for Jennings, who could not purchase the product due to his being in Drug Court, and Howard was aware that Jennings was drug tested. After driving away from the Walmart parking lot, when law enforcement stopped the vehicle to perform a search, Howard twice stated that he knew what precursors were. From this evidence, the jury could have reasonably determined that Howard had the intent to maintain dominion and control over the contraband and that he constructively possessed it. *See Woods v. State*, 640 N.E.2d 1089, 1091 (Ind. Ct. App. 1994) (explaining that "[c]onstructive possession of items found in a vehicle may be imputed to the driver of the vehicle" and affirming the defendant's possession of cocaine conviction where he was driving and the drugs were found under his seat).

[28] As to Howard's intent to manufacture methamphetamine, intent is a mental function, and the jury may rely upon "an examination of the surrounding circumstances to determine whether, from the person's conduct and the natural consequences of what might be expected from that conduct, a showing or inference of the intent to commit that conduct exists." *Tapely v. State*, 886 N.E.2d 61, 64 (Ind. Ct. App. 2008) (citing *West v. State*, 805 N.E.2d 909, 915

(Ind. Ct. App. 2004), *trans. denied*), *trans. denied*. Detective Brice testified that he was not aware of any other purpose for which the items found could be used collectively, and that ammonium nitrate, salt, and lithium were the only items missing for the two men to be able to manufacture methamphetamine. Howard also testified that he studied "extensively" about chemicals in community college coursework that he had completed. *Id.* at 272. The jury had sufficient evidence before it from which it could determine that Howard had the intent to manufacture methamphetamine.

[29] Based upon the record, we conclude that the State presented evidence of a probative nature from which a reasonable trier of fact could have found Howard guilty beyond a reasonable doubt of possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine as a class D felony. Howard's arguments to the contrary are an invitation to reweigh the evidence, which we decline to do.

## Conclusion

[30] For the foregoing reasons, we affirm Howard's conviction for possession of two or more chemical reagents or precursors with intent to manufacture methamphetamine as a class D felony.

[31] Affirmed.

Kirsch, J., and Mathias, J., concur.