## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 30 2017, 8:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Blair Todd
Law Office of Blair Todd
Winamac, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ryan Martin,<br>*Appellant-Defendant*, | June 30, 2017 |
| | Court of Appeals Case No.<br>75A04-1609-CR-2098 |
| v. | Appeal from the Starke Circuit Court |
| State of Indiana,<br>*Appellee-Plaintiff*. | The Honorable Kim Hall, Judge |
| | Trial Court Cause No.<br>75C01-1501-F5-4 |

**Brown, Judge.**

[1] Ryan Martin appeals his conviction for dealing in methamphetamine as a level 5 felony. He raises one issue which we revise and restate as whether the trial court abused its discretion in admitting testimony indicating that he was on probation and that the rules of his probation provided that he would waive his Fourth Amendment right and submit his place of residence to a reasonable search. We affirm.

## Facts and Procedural History

[2] On January 23, 2015, Starke County Sheriff's Chief Detective Rob Olejniczak and Jaime Fletcher conducted a search of a residence Detective Olejniczak believed was owned by Martin's mother following Martin's consent.[1] Martin advised Detective Olejniczak that he was staying at the residence. Police discovered a bag in the corner of the front porch containing drug paraphernalia, syringes, and bottles. They also discovered a coffee filter with methamphetamine residue outside. Inside the residence, they discovered rolling papers, a glass smoking pipe, empty pill packages for pseudoephedrine, leftover remnants from meth, a coffee grinder with white residue in it, three containers of iodized salt in a dresser drawer in a bedroom, a bottle of sulfuric acid, an empty package of lithium batteries, and a spoon with white residue. Police discovered an active one pot methamphetamine lab in a closet and a spent one pot lab in the kitchen.

---

[1] Outside the presence of the jury, the court stated that Jaime Fletcher was Martin's probation officer.

[3]     Detective Olejniczak interviewed Martin that evening, and Martin indicated that he had given consent to search. Martin stated that Dave Howard ground up the pills and that certain items belonged to Carl Daugherty. When asked what he would "get out of the cook," Martin answered that he would receive fifty dollars or a half a gram of methamphetamine and that he received half a gram a couple of times. State's Exhibit 56 at 11:25-11:30. When asked if he bought items for them, he said no. When asked if he bought Sudafed for them, he said he did because it was something they could obtain only so many a month and that he would receive fifty dollars. He indicated that others made methamphetamine and that they would make it upstairs and downstairs.

[4]     On January 26, 2015, the State charged Martin with: Count I, dealing in methamphetamine as a level 5 felony; Count II, possession of methamphetamine as a level 6 felony; Count III, maintaining a common nuisance as a level 6 felony; and Count IV, possession of paraphernalia as a class A misdemeanor. The State later amended the information to add the charge of dealing in methamphetamine (aiding, inducing or causing) as a level 5 felony.[2]

[5]     In July 2016, the court held a jury trial. After the State rested, Martin testified that he was staying at the home "[t]emporarily, in and out" and that he had

---

[2] The State also charged Martin with possession of marijuana as a class B misdemeanor. In July 2016, Martin pled guilty to possession of marijuana as a class B misdemeanor, and the court entered judgment of conviction on that count and sentenced him to zero days. The remaining counts were tried before a jury.

been staying there "for probably a couple of years." Transcript Volume II at 245. He testified that other people stayed overnight at the residence including Howard, Gracie Bell, and her boyfriend, and that the property had been burglarized. He testified that he did not manufacture meth in the home, that he caught Howard and Daugherty manufacturing meth in the basement of the home, and that he told them he did not approve and did not like it. He stated that the paraphernalia found in the home did not belong to him and that he assumed it belonged to Daugherty and Bell because they were staying there. He also testified that he knew that the one pot in the brown bag was there, but did not know about the one in the closet.

[6]     The following exchange occurred during the direct examination of Martin:

> Q     Did you consent to the interview?
>
> A     Yes, I did.
>
> Q     Why?
>
> A     Because I thought my house was clean. I was – I mean it was clean. If I knowed [sic] that thing was there, I would have never consent to a search warrant – or a search.

Transcript Volume III at 7. On cross-examination, when asked if it was right that he told Detective Olejniczak that he was buying Sudafed so they could make meth, he answered: "Not for them to make it, no, I didn't know what was goin' on at the time." *Id.* at 9. He then testified: "I bought boxes to get money

or another half gram, yes, 'cause I was using." *Id.* He testified that he was in the house a couple of days before being arrested, that he was "in and out" and was not staying there full-time. *Id.* at 11. He indicated that he was not there the weekend before, but that he probably remembered telling Detective Olejniczak in the interview that Daugherty and Bell came over to the house the Friday before, and that he bought Sudafed for them.

[7] During cross-examination of Martin, the following exchange occurred:

> [Prosecutor]: May we approach, Judge?
>
> THE COURT: Yes.
>
> (Side bar at 10:36:42 a.m.)
>
> [Prosecutor]: (inaudible – whispering)
>
> [Defense Counsel]: (inaudible) object (inaudible) prejudicial.
>
> THE COURT: (inaudible) the very thing that the – the State is arguing against, and that is to give the impression that (inaudible – whispering). And now he's opened the door and the State is allowed to go into that. Limited, very limited. (inaudible) didn't have the right to *deny* the search. Okay? That's all.
>
> **END SIDE BAR**
>
> Q Mr. Martin you told the jury just a little while ago that you didn't know any of that stuff was in your house and that's why you consented to the search, is that right?

A  Yes.

Q  That's what you told them?

A  Uh – yeah, I assumed the officer (inaudible).

Q  That's not true, right?  You didn't have a right to deny the search because you were on probation, right Mr. Martin?

A  Correct.

Q  And one of the terms of your probation is, the probation department can conduct a search of your home for compliance?

A  Correct.  But at the time I was off – I should have been off probation a whole year prior to that.  I had one (1) year probation and this was two (2) years after.

Q  Well you know why that –

A  (inaudible)

Q  -- you know why that happened though.

A  Because my fees were not paid.

Q  So you're still on probation; you knew you were on probation –

A  I didn't know – no, I didn't know that.

Q  Really?  Jaime Fletcher was your probation officer and you talked with her and you had a meeting scheduled with her that very day, right?

A  No, I did not.  I had court that very day at 9:00.  When I came to court is when I was pulled out for probation because she pulled me out from court.  That's when Roger was here and Officer Combs was there.  So they pulled me out.  They took me out.

Q  You knew a term of your probation was that you couldn't object to them doing a reasonable search of your home for compliance, right?  You understand that as a term.

A  I didn't object to them searchin' the house, no.

Q  But you didn't have a right to object.  That's what I'm trying to get through to you, Mr. Martin.

A  I didn't know 'cause I didn't know I was – I wasn't aware that I was on probation.

Q  You didn't know that?

A  They told me they were gonna' do a probation search and I said that's fine, go ahead.  I didn't deny it.  Didn't tell 'em not to.  But I should have been off probation January 23rd 2014, a full year prior to this.

Q  You know why that's not true, Mr. Martin.

A  Now I know, yes.

Q "I will not move from my residence without first contacting my probation officer." So all the times that you told the jury about hoppin' around, did you contact her every time you did that?

A She knew I was paintin', yes.

*Id.* at 21-24.

[8] The court then took a break and the following exchange occurred outside the presence of the jury:

THE COURT: All right, everyone could have a seat. For the record, the jurors have left the courtroom and we had a conversation at the bench a few minutes ago – um – and I'll make the record now that the jurors aren't here so it's clear that . . . the prosecutor represented to the Court that . . . the prosecutor believed [Martin] had opened the door to permit the prosecutor to go into the fact that he was on probation because of some of his testimony on direct examination. Specifically, I found that when [Martin] testified to the jury that he would not have consented, if he had known there was somethin' in there, or in the other way to reference it, that he only consented because he believed the residence was clean, he opened the door to permit the State to introduce evidence that his consent wasn't necessary. There was no importance placed on his consent. It was a different situation than a regular citizen would be in because jurors themselves would think, as well, if they had a clean house and the police came there to search, they would consent. And if they did not have a clean house and the police came there to search, they would not sign a consent. So that puts fairly significant weight into [Martin's] testimony in the minds of the jury when they have the impression that [Martin] *could* have denied the search but he consented, suggesting he had no knowledge of any drugs. The State had indicated to the Court,

before the trial ever started, that Jaime Fletcher, the first witness in the case, was in fact on the day in question, [Martin's] probation officer. She was there at the residence, she conducted a probation search. Why anyone asked him for his consent, I have no idea. I suppose they could do that all they want, but, we end up with this confusion here with the jury, I guess, nevertheless, uh – the State, I permitted, to – during cross examination, in order to make things more fair now, to expose to the jury that [Martin] did not have the consent as anyone else might have had that same consent; that regardless of his consent, there was going to be a search of his residence because legally the authorities could search his residence, because he was on probation. Now I said to the prosecutor and defense lawyer that it needed to be narrow and they were allowed to question – to bring up that – that point. There's no need to go into what the conviction was that led to his probation, what the sentence was. And . . . that has been accomplished now. And now I see things starting to . . . broaden. Uh – the prosecutor's got out conditions of probation and is now confronting [Martin] with a specific condition that he notify the probation officer of his specific address at all times and that contradicts some of his testimony about how he had moved around and apparently never told the probation department. And this is what I don't want to have happen, with the jury. So I sent the jurors out (1) to make the record clear as to why I even allowed the State to bring up the fact that [Martin] was on probation, and then 2) to make sure we all know what the rules are for this. . . . I'm not interested in going through the conditions of probation and how they – they've been violated in some capacity or not. Uh – when he said "I thought probation should have been over a year ago." That – that does open the door some more 'cause now he's suggested that therefore his consent is important now. And so I think the State *can* go into why it's – they don't think his statement is true. He thought probation was over a year earlier and his consent *was* important. While I think we've covered that, I'm not sure, but what I don't want to have happen is any *more* goin' into, as far as whether he violated the terms of his

probation as a result of his testimony on direct or his statement. It was done for that limited purpose to show the jury that his consent wasn't necessary because officials have the right to search the residence whether they consented or not. I'm done talkin'. Now it's the State's opportunity to make any record you'd like.

[Prosecutor]: I understand the Court's concern. I was *shocked* at his justification. "I should have been off of probation." And he knows that he had probation violations filed against him which is what *told* [sic] the time he was on probation. And he had other pending cases. So, I could argue that he's opened the door to all that. Um – do I think it's necessary to jump in there? No, I – I – I didn't. But, I understand what – what the Court's saying. I – I appreciate that. Um – I would just ask permission at this point to address the one (1) area in the probation rules about waiving the right and they have a right to search your home. And then I'll move on from that.

THE COURT: I think that's gonna' be fine to summarize that for the break then the jurors might know that that's what we were talkin' about. Any record you'd like to make, [Defense Counsel]?

[Defense Counsel]: That limited purpose is fine that the State was talking about.

*Id.* at 24-28.

[9]     After the jury was brought back into the courtroom, the following exchange occurred:

Q   Part of what your rules of probation say that you'll waive your Fourth Amendment right and you will submit your person, place

of residence, and vehicle to a reasonable search and seizure any time by my probation officer and/or law enforcement officer in the presence of a probation officer. Do you recognize that to be one of the rules of probation, correct?

A Correct.

*Id.* at 28-29.

[10] The jury found Martin guilty of maintaining a common nuisance as a level 6 felony, possession of methamphetamine as a level 6 felony, and dealing in methamphetamine (aiding, inducing or causing) as a level 5 felony.

[11] On August 15, 2016, the court entered judgment of conviction for dealing in methamphetamine (aiding, inducing, or causing an offense) as a level 5 felony and declined to enter judgments of conviction for the other counts. The court sentenced Martin to five years and ordered that the sentence be served consecutive to sentences in three other causes.

## Discussion

[12] The issue is whether the trial court abused its discretion in admitting testimony indicating that Martin was on probation and that the rules of his probation provided that he would waive his Fourth Amendment right and submit his place of residence to a reasonable search. Martin argues that the trial court erred in permitting the State to impeach him by establishing that he had been on probation at the time of the charged offense in violation of Ind. Evidence Rule 403. He asserts that the record suggests and supports that a

contemporaneous objection was made as to the prejudicial nature of the cross-examination at issue and that, even if there was no objection, the admission constituted fundamental error. He asserts that he merely commented on his motivation for consenting to the search of his residence and that the court's ruling went further than needed by allowing the State to cross-examine him regarding his status as a current probationer at the time of the offense. He contends that allowing the State to elicit testimony that he was on probation led the jury to understand that he had a criminal conviction and had bad character and that he was prejudiced.

[13] The State argues that Martin waived his appellate claim by failing to make a contemporaneous objection and by agreeing that the State could introduce the text of the probation condition. The State also argues that, even assuming Martin had properly objected, the court would not have abused its discretion in overruling an objection under Ind. Evidence Rule 403. It asserts that Martin opened the door to evidence that he could not refuse a search and that the jury was left with a false or misleading impression that he consented to the search because he had no knowledge of or incriminating connection to the objects ultimately found in his home. The State argues that, even if error, the admission of the testimony was harmless because evidence of Martin's guilt was overwhelming.

[14] Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the

logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. We will not reverse an error in the admission of evidence if the error was harmless. *Turner v. State*, 953 N.E.2d 1039, 1058 (Ind. 2011). Errors in the admission of evidence are to be disregarded unless they affect the defendant's substantial rights. *Id.* at 1059. In determining the effect of the evidentiary ruling on a defendant's substantial rights, we look to the probable effect on the fact finder. *Id.* The improper admission is harmless error if the conviction is supported by substantial independent evidence of guilt satisfying the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction. *Id.* Failure to timely object to the erroneous admission of evidence at trial will procedurally foreclose the raising of such error on appeal unless the admission constitutes fundamental error. *Stephenson v. State*, 29 N.E.3d 111, 118 (Ind. 2015). Additionally, we have found the issue waived where a defendant objected to only a portion of the challenged evidence. *See Dickey v. State*, 999 N.E.2d 919, 921 (Ind. Ct. App. 2013); *Hutcherson v. State*, 966 N.E.2d 766, 770 (Ind. Ct. App. 2012), *trans. denied*.

[15] The record reveals that Martin's counsel stated the following during a sidebar: "(inaudible) object (inaudible) prejudicial." Transcript Volume III at 22. After some testimony and discussion, the prosecutor asked for permission to address the one area in the probation rules "about waiving the right and they have a right to search your home." *Id.* at 27. Defense counsel stated: "That limited purpose is fine that the State was talking about." *Id.* at 28. At that point,

Martin recognized that part of his rules of probation provided that he would waive his Fourth Amendment right and submit his place of residence to a reasonable search and seizure any time by his probation officer and/or law enforcement officer in the presence of a probation officer. We conclude that Martin waived this issue.

[16] To the extent Martin asserts fundamental error, we observe that fundamental error is an extremely narrow exception that allows a defendant to avoid waiver of an issue. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). It is error that makes "a fair trial impossible or constitute[s] clearly blatant violations of basic and elementary principles of due process . . . present[ing] an undeniable and substantial potential for harm." *Id.* "This exception is available only in 'egregious circumstances.'" *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010) (quoting *Brown v. State*, 799 N.E.2d 1064, 1068 (Ind. 2003)), *reh'g denied*. "Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error." *Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014), *reh'g denied*.

[17] Ind. Evidence Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."

To the extent that Martin asserts that he was exposed to the likelihood that the jury would convict him not for the merits of the case but rather on the implication of his bad character flowing from his prior conviction, we observe that Ind. Evidence Rule 404(b) provides:

> Crimes, Wrongs, or Other Acts.
>
> (1) *Prohibited Uses*.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2)  Permitted Uses; Notice in a Criminal Case.  This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  On request by a defendant in a criminal case, the prosecutor must:
>
>> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and
>>
>> (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

The rule is "designed to prevent the jury from assessing a defendant's present guilt on the basis of his past propensities." *Hicks v. State*, 690 N.E.2d 215, 218 (Ind. 1997).  In determining whether to admit evidence of specific acts under the rule, the trial court is to: (1) determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's

propensity to commit the charged act; (2) determine that the proponent has sufficient proof that the person who allegedly committed the act did, in fact, commit the act; and (3) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009), *reh'g denied*. Additionally, otherwise inadmissible evidence may become admissible where the defendant "opens the door" to questioning on that evidence. *Jackson v. State*, 728 N.E.2d 147, 152 (Ind. 2000). However, "the evidence relied upon to 'open the door' must leave the trier of fact with a false or misleading impression of the facts related." *Id.*

[19] During direct examination, Martin testified that "[i]f I knowed [sic] that thing was there, I would have never consent to a search warrant – or a search." Transcript Volume III at 7. We agree with the State that this testimony left the jury with a false or misleading impression. While Martin's testimony indicated that he never would have consented to a search if he had known of the incriminating evidence, he was on probation and the rules of probation provided that he had waived his Fourth Amendment right and would submit to a search of his residence. This evidence was admissible to challenge the impression that Martin would not have consented and had the authority to not consent had he known of the incriminating evidence. We also note that the trial court limited the prosecutor's questioning regarding Martin's probation. We cannot say that the admission of the fact that Martin was on probation and that the probation rules provided he would consent to a search amounted to fundamental error.

[20] We also observe that the trial court ultimately entered a conviction for dealing in methamphetamine (aiding, inducing, or causing an offense) as a level 5 felony and there was substantial independent evidence of Martin's guilt. The police discovered drug paraphernalia, syringes, rolling papers, empty pill packages for pseudoephedrine, a coffee filter with methamphetamine residue, an empty package of lithium batteries, methamphetamine residue on a plate, a bottle of sulfuric acid, an active one pot meth lab, and a spent one pot at the residence where Martin was staying. During the interview, when asked what "would you get out of the cook," Martin answered that he would receive fifty dollars or a half a gram of methamphetamine. State's Exhibit 56 at 11:25-11:30. He also stated in the interview that he bought Sudafed for the others because they were limited in the amount they could purchase a month. He also indicated that others made methamphetamine upstairs and downstairs in the residence. We conclude that, even assuming the admission of the fact that Martin was on probation and that the probation rules provided he would waive his Fourth Amendment right and submit his place of residence to a reasonable search was erroneous, there is no substantial likelihood the challenged evidence contributed to the conviction.

## Conclusion

[21] For the foregoing reasons, we affirm Martin's conviction.

[22] Affirmed.

May, J., and Pyle, J., concur.