# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 25 2019, 10:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Aaron Michael Toller,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 25, 2019

Court of Appeals Case No.
18A-CR-2393

Appeal from the
Madison Circuit Court

The Honorable
Thomas Newman, Jr., Judge

Trial Court Cause No.
48C03-1612-MR-2547

**Altice, Judge.**

[1] Following a jury trial, Aaron Michael Toller appeals his conviction and sentence for murder, a felony, and his sentences for Level 6 felony obstruction

of justice, Class A misdemeanor false informing, and two counts of Class A misdemeanor carrying a handgun without a license. He raises several issues that we restate as:

> I. Did the trial court abuse its discretion when it excluded text messages between Toller and the victim, Lindsey Wilkins?

> II. Did the trial court abuse its discretion in sentencing Toller?

> III. Is Toller's sentence inappropriate in light of the nature of the offense and the character of the offender?

[2] We affirm.

## Facts & Procedural History

[3] At around 11:20 p.m. on December 7, 2016, thirty-three-year-old Wilkins left her job at a restaurant and picked up her eight-year-old daughter, C.W., from the home of Wilkins's grandmother, Judith Wilkins (Judith), who was caring for C.W. while Wilkins was at work. Judith recalled that Wilkins was "her normal self" and her mood seemed "fine" when she stopped at the house for C.W. *Transcript Vol. II* at 43. Wilkins then picked up her fiancé, Toller, age twenty-three, and the three went to the home where they lived together. During the ride, Toller and Wilkins were "kind of" angry with each other. *Transcripts Vol. III* at 159. At home, Wilkins tucked her daughter into bed as normal.

[4] At 1:51 a.m. on December 8, Madison County emergency dispatch received a 911 call from Toller screaming, "[M]y girlfriend just shot herself." *Transcript*

*Vol. II* at 240. He told the dispatch operator that Wilkins had shot herself in the head, that he did not know where the gun was, and that Wilkins's daughter was asleep in the house. When Toller was asked whether he was there when it happened, Toller said, "No." *Id*. at 241. Toller stayed on the line with 911 dispatch until police arrived. Wilkins's mother, Jennifer Wilkins (Jennifer) received a call from Toller at about 1:56 a.m., telling her to get up and get to the house, as Wilkins had been shot.

[5] Anderson Police Department Officer Michael Lee was the first to arrive at the scene at 1:54 a.m. In the front yard, he came into contact with Toller, whose demeanor Officer Lee described as "excited" or "heightened." *Id*. at 50, 61. Toller told Officer Lee that his girlfriend had been shot and that she was on her bed. Toller did not say anything about suicide to Officer Lee. Officer Zach Seig arrived next, and he stayed with Toller, while Officer Lee went inside. Officer Lee found Wilkins on the bed, dressed, and with her feet under a comforter. Officer Lee touched, but did not move, her right wrist to check for a pulse, but found none. He saw some pills, later determined to be acetaminophen, on the floor, as well as a silver shell casing. He did not see a firearm in the room.

[6] Toller told Officer Seig that he had walked to the home from another location and that when he entered the house, he could smell gun powder, and then he found Wilkins deceased from a gunshot to her head. Officer Seig asked Toller "more than once" if he had touched or moved anything, and Toller replied that he had not. *Id*. at 68.

[7] Officer Joe Garrett was the third officer on the scene, and he checked on C.W., who was asleep in her room, and he sat in a chair outside her door to intercept her if she woke and exited her room. Officer Garrett remained there thirty to forty-five minutes, and during that time, Toller "came up and kneeled on the floor beside [him] and asked what was taking so long," and Officer Garrett explained that they were waiting on the coroner "to get there in order for us to move the body to try to discover the gun" that might have been under her. *Id.* at 110. Toller matter-of-factly replied, "I don't think you're going to find a gun . . . I don't think that there's any guns in this house." *Id.* at 111. This struck Officer Garrett as "very odd" and "suspicious" as there was a bullet wound to Wilkins's head and a shell casing on the floor. *Id.* Officer Garrett explained that, since she died from a gunshot wound, police were going to look for a gun, to which Toller stated, a couple of times, "I can't believe this sh*t" and then he got up and walked outside. *Id.* Eventually, C.W. woke and Toller came and carried her outside to her grandmother. C.W. recalled that Toller "said sorry over and over again" to her. *Transcript Vol. III* at 160.

[8] Officer Bert Chambers, a scene technician, was at the home within minutes of the dispatch. It "immediately" raised suspicion to him and other officers that that there was no gun, but he recognized it might have been under Wilkins's body. *Transcript Vol. II* at 132. After taking pictures and assisting the coroner with moving Wilkins's body, Officer Chambers checked for weapons and found none. Sergeant Nicholas Durr arrived and was advised by the other officers that it was a possible suicide with gunshot to the head but the gun was not

located inside the house, so he called for a detective with the criminal investigation division. Detective Norman Rayford responded and arrived on the scene around 3:15 a.m.[1]

[9] Later that morning, around 7:30 a.m., Toller waived his rights and agreed to a recorded interview with Detective Rayford. Toller said that he walked part of the way home and entered the house, smelled gunpowder, and found Wilkins deceased. Toller thereafter agreed that, given there was no gun, it was not suicide and someone else shot her, but he maintained it was not him. Toller suggested that Wilkins's ex-boyfriend, Shawn, who was in prison, may have hired some other person to kill Wilkins. Detective Rayford suggested that any such person who would commit a "hit" like that would have killed C.W. also because she could tell on them, to which Toller responded, "[b]ut she didn't come out" of her room. *Transcript Vol. IV* at 173.

[10] When asked if he carried any weapons, Toller stated that he had a Glock .40 caliber but that he had hidden it three and one-half weeks prior to Wilkins's death in a tree line in a nearby field. When Detective Rayford asked Toller "what happens when that Glock comes back to be the same weapon that fired a

---

[1] We note that Detective Rayford's testimony begins in *Transcript Volume III*, which ends at page 250. *Volume IV* begins during Detective Rayford's direct examination, but it does not resume at the same point where his testimony ended in *Volume III*, indicating that a portion of his testimony may be missing from the record before us.

bullet that went through her head?", Toller replied, "I can guaranty [sic] you it's not." *Id.* at 155.

[11] Toller agreed to assist police with locating the Glock, which Toller then said was Wilkins's gun, not his. Detective Jake Brooks located the .40 caliber Glock handgun under some leaves that morning around 9:00 a.m. The firearm barely had frost on it and did not have any surface rust on it, although in Detective Brooks's personal experience, a firearm left outside would begin to show signs of surface rust after approximately a week, depending on the weather. As part of the investigation, Detective Brooks collected Toller's clothing including a blue sweatshirt, which had what Detective Brooks believed was blood stains on one sleeve. At a later date, when a prosecutor asked to view the evidence in the case, Detective Rayford removed the sweatshirt from the evidence bag, and a white pill fell out of the sweatshirt, which was determined to be acetaminophen, the same as what was scattered on the floor of the bedroom.

[12] Later in the police interview, when Detective Rayford was urging Toller to "accept responsibility for what happened at that house," Toller stated twice, "[Wilkins] killed herself." *Id*. at 179. He said that he was not in the room but was in the house and "heard the gun go off." *Id*. at 180. Detective Rayford asked where the gun was, and Toller said that, in a panic, he had thrown it behind a nearby abandoned building. He described it as a 9 mm black and silver handgun and stated that he did not know whom it belonged to. He explained that he "freaked out" and threw it because he was on probation and did not want to be in a house with a gun. *Id*. at 185. He thereafter told

Detective Rayford, "I got her the gun," stating that he bought it from a co-worker named Keith about a week prior. *Id*. at 186.

[13]   Using Toller's description of the gun's location, a detective and an evidence technician located a Taurus 9 mm semi-automatic pistol around 1:30 p.m. It was later determined that the bullet that caused Wilkins's death came from that Taurus handgun. It was also determined that two days before Wilkins's death, on December 6, Toller had gone to the Keith's home and purchased the Taurus 9 mm from him. At the time of the sale, Keith had prepared a bill of sale, which reflected the same serial number as that on the gun collected by police. Wilkins's daughter, C.W., was present when Toller purchased this gun, and she asked Toller at that time why he was purchasing it and, "under his breath[]" Toller said to her, "You'll see." *Transcript Vol. III* at 157.

[14]   Dr. Thomas Sozio, a forensic pathologist, conducted the autopsy on December 9. Dr. Sozio observed "high velocity blood spatter" to Wilkins's left and right hands. *Id.* at 34. Based on his observation at the entrance wound on Wilkins's right temple, Dr. Sozio opined that the gun had firm contact with Wilkins's head. Dr. Sozio noted that the toxicology report indicated a metabolized blood alcohol concentration of .016 (that may have been .021 at some earlier point), as well as an "elevated level of acetaminophen" in her system. *Id*. at 40-41. She also had a low level of Alprazolam, or Xanax, in her system, which, combined with the alcohol, might have made her drowsy but would not have resulted in an overdose. Dr. Sozio concluded that "nothing in the [t]oxicology report" impacted the cause of death, which was a gunshot to the head. *Id*. at

39. On the day of autopsy and in his written report issued on December 23, Dr. Sozio identified the manner of death as suicide.

[15] After an investigation that included conversations with law enforcement and review of autopsy results, the Madison County Coroner issued a death certificate in August 2017, identifying the cause of death to be gunshot to the head and the manner of death to be undetermined.

[16] On December 14, 2016, the State charged Toller with murder, a felony. In August 2017, the State added the following charges: Level 6 felony obstruction of justice, Level 6 felony residential entry, Level 6 felony neglect of a dependent, Class A misdemeanor false informing, and two counts of Class A misdemeanor carrying a handgun without a license. The State later dismissed the residential entry and neglect of a dependent charges.

[17] Prior to trial, the State and Toller stipulated that Toller would submit to a video-recorded polygraph test and that the results would be admissible at trial. Indiana State Police Sergeant John Campbell administered the test to Toller in November 2017. Toller was in custody and he was transported to the Pendleton Police Post, where he met his counsel and they had an opportunity to review a list of questions that would be asked. Sergeant Campbell's opinion was that Toller was "deceptive on the two relevant questions" that asked Toller if he shot Wilkins. *Transcript Vol. IV* at 111. Sergeant Campbell ran the test results through a computer algorithm that indicated "[t]here was a less than one percent chance that [Toller] was truthful." *Id.*

[18] On July 30, 2018, the State filed a motion in limine to exclude, among other things, evidence regarding Wilkins's mental health because Toller had not provided any medical records or witnesses in discovery. Toller argued he was not seeking to admit professional diagnosis, but asserted that lay testimony, including past statements of the victim regarding her then-existing mental or emotional condition would be admissible under Ind. Rule Evidence 803(3). The trial court granted the State's motion but indicated it would allow Toller to present offers to prove, out of the jury's presence, with testimony of four of Wilkins's family members, who testified that Wilkins never threatened suicide or attempted suicide.

[19] At the July 2018 jury trial, Wilkins's mother, Jennifer, described Toller's demeanor on the phone when he called her to say that Wilkins had been shot as "calm." *Transcript Vol. II* at 4. According to Jennifer, when she arrived at the house, Toller came up to her, gave her a hug, and said, "I'm so sorry" and "I didn't mean for this to happen. I didn't want it to end this way." *Id*.

[20] Wilkins's sister, Simanney, testified that she and Toller were both working at a Noblesville restaurant on December 7, 2016. She stated that Toller was angry at her for having told Wilkins that Toller appeared to be having a relationship with another female employee at work named Monica Dorsey. That night, Toller told Simanney that "if [she] would just keep her mouth shut that [he and Wilkins] would not be arguing" and that "it was all [Simmany's] fault" for telling Wilkins about Dorsey. *Id.* at 34. Simanney testified that she called Wilkins that night and told her about having had that conversation with Toller.

[21] Dr. Sozio testified that, although his December 2016 autopsy report had indicated the manner of death as suicide, he subsequently became aware that some information he had relied upon was inaccurate or incomplete. He further stated that, after having received further information concerning the circumstances surrounding Wilkins's death, he no longer felt confident in calling Wilkins's death a suicide and changed his opinion on the manner of death to "undetermined." *Transcript Vol. III* at 71. Dr. Sozio observed that, in the case of suicide, blood spatter would "typically" be seen on one hand, but in this case both hands had the blood spatter, which reflected that both of her hands were up near the entry wound. *Id.* at 35. Regarding the trajectory of the bullet, he noted that the typical pattern he sees in the case of a suicide with a gunshot to the head is moving from the right to left but also going "upwards from the front to the back," which was not present in Wilkins's case. *Id*. at 72.

[22] David Jordan and Christopher Short, two men who had, separately from each other, shared a Madison County jail cell with Toller, testified that Toller stated that he shot Wilkins. Short shared a maximum security dorm-style jail cell with Toller on two different occasions in 2017 for ninety days each. According to Short, Toller gave varying accounts but said on ten or more occasions that he killed Wilkins by shooting her in the right side of the head. Toller told Short that he "was trying to make it look like she had done it herself[.]" *Id.* at 207. He did it because he had found a new "true love" named Monica a few weeks prior and needed to "get rid of the psycho[.]" *Id.*

[23] Jordan shared a cell with Toller on two occasions in February 2017. Toller told Jordan, "I killed my girl" but "I got a way where I might be able to get out of it" explaining that he set it up to make it look like a suicide. *Id.* at 231. Jordan said that Toller indicated he "freaked out" at the time of the shooting and "got rid of the gun." *Id.* at 233. Jordan said that during the time he was with Toller in jail, a female came to visit Toller to bring him money and Jordan commented that she was good looking, and Toller replied, "[N]ow you see why I killed [Wilkins] for her." *Id.* at 235.

[24] Detective Rayford testified about his investigation and interview with Toller, which was played to the jury. On cross-examination, after Detective Rayford confirmed that Wilkins's and Toller's cell phones had been sent to Indiana State Police (ISP) for an extraction report, Toller sought to admit a series of text messages exchanged between Toller and Wilkins in the hours leading up to her death. The State objected on the basis of hearsay and relevance, and Toller argued that the texts were relevant to the jury issue of whether her death was a suicide or homicide and that the texts were admissible under Ind. Evidence Rule 803(3) concerning the declarant's then-existing state of mind. The trial court sustained the State's objections and excluded the text messages, and Toller made an offer of proof. To make additional record on the issue, Toller indicated an intention to call as a witness the ISP expert who prepared the extraction report and to re-offer the text messages into evidence. The State agreed that the witness would provide proper foundation but again objected on

the basis of hearsay. The trial court again sustained the State's objection and excluded the texts.

[25] The jury returned guilty verdicts on all charges: murder, Level 6 felony obstruction of justice, Class A misdemeanor false informing, and two counts of Class A misdemeanor carrying a handgun without a license. The trial court held a sentencing hearing on September 7, 2018. It sentenced Toller as follows: sixty-five years for murder, two and one-half years for obstruction of justice, one year for false informing, and one year each on the two carrying a handgun without a license convictions. The court ordered the sentences to be served consecutively for an aggregate term of seventy and one-half years, all to be executed in the Indiana Department of Correction. Toller now appeals.

# Discussion & Decision

## I. Exclusion of Evidence

[26] Toller asserts that the trial court erred when it excluded a series of text messages that he and Wilkins had exchanged in the twenty hours prior to her death. A trial court exercises broad discretion in ruling on the admissibility of evidence, and an appellate court should disturb such rulings only where it is shown that the court abused its discretion. *Camm v. State*, 908 N.E.2d 215, 225-26 (Ind. 2009). Moreover, errors in the admission or exclusion of evidence will be disregarded as harmless unless they affect the substantial rights of a party. Ind. Trial Rule 61; Ind. Evidence Rule 103(a). "In other words, we will find an error in the exclusion of evidence harmless if its probable impact on the jury, in

light of all of the evidence in the case, is sufficiently minor so as not to affect the defendant's substantial rights." *Barnhart v. State*, 15 N.E.3d 138, 143 (Ind. Ct. App. 2014).

[27] Toller maintains that the texts were admissible under Evid. R. 803(3), which creates a hearsay exception for statements of the declarant's then-existing state of mind at the time the statement was made. State of mind, as that term is defined, may include emotion, sensation, physical condition, intent, plan, motive, design, mental feeling, pain, and bodily health. *Camm*, 908 N.E.2d at 226. In criminal cases involving out-of-court statements of a victim's state of mind, our Supreme Court has identified three instances where such statements may be admissible, the third of which is relevant in this case: "'[T]o show the intent of the victim to act in a particular way.'" *Id.* (quoting *Hatcher v. State*, 735 N.E.2d 1155, 1161 (Ind. 2000)). Such declarations may be admitted not only as proof of the declarant's then-existing state of mind, but also as circumstantial evidence of the declarant's future conduct.[2] *Id.* "A jury may infer from the declarant's past state of mind that the declarant held the same mental state at a future time and acted on it." *Id.*

---

[2] The *Camm* Court explained that this sub-category of evidence is permitted because it lacks many of the dangers traditionally associated with hearsay. 908 N.E.2d at 226. That is, a jury's connecting a declarant's expressed mental state to their actions requires inferring only that one generally does what they intend, with no need to appraise memory, perception, or testimonial qualities. *Id.*

[28]     Here, the series of text messages that were excluded occurred between December 7 at 7:35 a.m. and December 8 at 12:59 a.m., when Wilkins picked up Toller. Included within the lengthy text dialogue were the following statements by Wilkins:

> I took some stuff to help knock me out. I was tired of worrying bout what you were out there doing and who you were with. [Dec. 7, 2016, 7:38 a.m.]

> My anxiety about this is at a maximum. All i can think of is how to make it go away. [Dec. 7, 2016, 4:08 p.m.]

> Its [sic] so overwhelmingly [sic] thinking about u spending any time with her it makes me wanna just go get high and forget it. [Dec. 7, 2016, 4:11 p.m.]

> Feel like i could have a heart attack at any moment. Another reason i know your [sic] the one. Never have i been more scared to lose anyone ever. [Dec. 7, 2016, 4:51 p.m.]

> I cant [sic] mentally, physically or emotionally deal the thought of u spending time with any other girl or woman. [Dec. 7, 2016, 5:19 p.m.]

*Exhibit Vol. 2*, Defendant's Exhibit E at 27, 40, 43, 44. Toller urges that the messages show a distraught state of mind from which the jury could have inferred that she chose to act in the future – take her own life – rather than live without a relationship with Toller. He claims that the exclusion of the text messages deprived him of the right to present a defense and that "[t]he messages were the only objective evidence . . . that supported his claim the

death was a suicide." *Appellant's Brief* at 11. The State counters that the trial court properly excluded the messages because they "did not indicate that Wilkins intended to act in any particular way" and "[a]t most . . . indicate[d] that Wilkins was upset" because she believed Toller was cheating on her with Dorsey. *Appellee's Brief* at 15.

[29] We find no need to resolve the dispute because, even if it was error to exclude the texts, such error did not affect Toller's substantial rights and was harmless, given the extensive evidence of his guilt. *See Hall v. State*, 36 N.E.2d 459, 474-75 (Ind. 2015) (exclusion of defendant's phone call with victim's mother, even if error, was harmless where State presented ample evidence of defendant's guilt and error did not contribute to verdict against him). Here, Toller told 911 that Wilkins had shot herself, but there was no gun at the scene. He lied to police at the scene by saying that he had not touched or moved anything when, in fact, he had discarded one and possibly two handguns before calling 911. Two days prior to Wilkins's death, Toller bought the Taurus 9 mm, which was used to kill Wilkins, and when C.W. asked him at that time why he was buying the gun, he told her, "You'll see." *Transcript Vol. III* at 157. While police were at the house investigating the shooting, Toller told police they were not going to find a gun in the house and that he could "guarant[ee]" that police would not later determine that the Glock fired the fatal bullet. *Transcript Vol. IV* at 155. He asked Officer Garrett, who was guarding C.W.'s room, what was taking so long with the process and when the officer explained they were looking for the gun, Toller stated, "I can't believe this sh*t." *Transcript Vol. II* at 111. When Toller

carried C.W. from her bedroom to her grandmother, he repeatedly told C.W. that he was sorry. He was inconsistent in his police interview with Detective Rayford, first saying it was suicide, then suggesting someone else killed her, then returning to the theory that it was a suicide but stating that he had "freaked out" and tossed the gun, from which the fatal shot was fired, behind an abandoned building. *Transcript Vol. IV* at 185. He also told Detective Rayford that he had hidden the Glock – which he first indicated was his and then later said was Wilkins's – more than three weeks prior, but it did not show signs of rust consistent with being outside for that period of time. There were acetaminophen pills scattered about the room and one fell from his sweatshirt that had been collected as evidence. He was found to be deceptive in a polygraph test when asked if he shot Wilkins. Toller was angry at Wilkins's sister, Simanney, for telling Wilkins about Dorsey and blamed her for his conflicts with Wilkins.

[30] Although Dr. Sozio initially reported the manner of death as a suicide, he changed that opinion to undetermined after learning further information that was not available to him at the time of his report. Additionally, Dr. Sozio noted that the trajectory of the bullet was not consistent with the typical pattern of suicide by gunshot to the head and the high velocity blood spatter on the back of both of Wilkins's hands was likewise not consistent with suicide. While in jail awaiting trial, Toller separately told Short and Jordon, who received no benefit for testifying, that he had shot Wilkins in the head and that he had staged it to make it look like a suicide. Given the wealth of evidence against

him, Toller has failed to show that the exclusion of the texts prejudiced his substantial rights and, accordingly, we conclude that any error in the exclusion of that evidence was harmless.

## II. *Abuse of Discretion in Sentencing*

[31]     Toller argues that his aggregate sentence of seventy and one-half years is an abuse of discretion. "Generally speaking, sentencing decisions are left to the sound discretion of the trial court, and we review the trial court's decision only for an abuse of this discretion." *Singh v. State*, 40 N.E.3d 981, 987 (Ind. Ct. App. 2015), *trans. denied.* An abuse of discretion occurs if the decision is clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Anglemeyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218. A trial court may abuse its discretion by failing to enter a sentencing statement, entering findings of aggravating and mitigating factors unsupported by the record, omitting factors clearly supported by the record and advanced for consideration, or giving reasons that are improper as a matter of law. *Id*. at 490-91. Remand for resentencing may be the appropriate remedy "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Id*. at 491.

[32]     In arguing that the trial court abused its discretion, Toller asserts that the impact on survivors was an improper aggravating circumstance as a matter of law because there was no evidence that the impact of the death was beyond that

which normally accompanies the violent death of a loved one.[3]  *See Smith v. State*, 770 N.E.2d 818, 821-22 (Ind. 2002) (recognizing that impact on others may qualify as an aggravator in certain cases where a defendant's actions had an impact "of a destructive nature that is not normally associated with the commission of the offense," but holding that the trial court's reliance on the impact on others was improper because "the trial court did not articulate how the impact on [the victim's three-year-old] child was of the type so distinct that it raised to the level of an aggravating factor").

[33]  Here, at the sentencing hearing, the trial court found as an aggravator that Toller was on probation at the time that he committed these offenses, and the court found no mitigators.  It thereafter stated that "this was a highly . . . premeditated [] murder" that "exemplified . . . a height of selfishness that is going to have extraordinary ripple effect over a lot of people for the rest of their lives[.]"  *Transcript Vol. V* at 201.  To the extent that the trial court did consider the impact on others to be an aggravating circumstance but failed to "articulate how the impact" was "so distinct that it raised to the level of an aggravating factor" as *Smith* requires, our courts have recognized that "when a trial court improperly applies an aggravator, but other valid aggravating circumstances exist, a sentence enhancement may still be upheld."  *Smith*, 770 N.E.2d at 822.

---

[3] Toller also argues that "the senselessness of the crime" was an improper aggravator because "[m]ost murders are by definition senseless."  *Appellant's Brief* at 25.  However, the trial court did not expressly state that the killing was senseless or identify such as an aggravator, and thus we do not reach Toller's argument on this point.

In the present case, the trial court found that this was a premeditated murder, and, at the time of the offenses, Toller was on probation and possessed two firearms. Toller does not claim that these circumstances are improper aggravators. We are confident that the trial court would have imposed the same sentence even if it had not found the impact on friends and loved ones to be an aggravating factor. Accordingly, we find no abuse of discretion in the trial court's sentencing of Toller. *See Edrington v. State*, 909 N.E.2d 1093, 1101 (Ind. Ct. App. 2009) (affirming sentence where appellate court was confident that trial court would have imposed the same sentence even if it had not considered an improper aggravator), *trans. denied*. The trial court did not abuse its discretion in sentencing Toller.

### III. Inappropriate Sentence

[34] We may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224. Deference to the trial court "prevail[s] unless

overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The burden is on the defendant to persuade us his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[35] When determining whether a sentence is inappropriate, the advisory is the starting point the Legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. For his murder conviction, Toller faced a sentencing range from forty-five to sixty-five years, with the advisory sentence being fifty-five years. Ind. Code § 35-50-2-3. For his Level 6 felony conviction for obstruction of justice, Toller faced between six months and two and one-half years, with the advisory being one year. I.C. § 35-50-2-7. Toller faced up to one year on each of his three Class A misdemeanors for false informing and carrying a handgun without a license. I.C. § 35-50-3-2. The trial court ordered the maximum sentences on each conviction and ordered them to be served consecutively for a total of seventy and one-half years.

[36] As to the nature of the offenses, Toller shot Wilkins at close distance in her temple, with her daughter sleeping in the other room. The killing was premeditated and without provocation. Before calling 911, he admittedly disposed of one and, police believed, two guns. He purchased the 9 mm handgun used to kill her just days before from a coworker. When he left the house to dispose of the guns, he left Wilkins's eight-year-old daughter in the

home alone with her mother's dead body in a nearby room. According to Wilkins's mother, Jennifer, Toller's delay "left it impossible that her organs could be donated" as Wilkins wanted. *Transcript Vol. V* at 191. There is nothing about the nature of the offenses that warrants revision of Toller's sentence.

[37] As to Toller's character, we recognize that his criminal history was minimal, with one misdemeanor, but he was on probation at the time of his offenses. He possessed two firearms when he was to have none. The evidence reflects and the court found that Toller planned the murder. He bought the handgun and when eight-year-old C.W. inquired why he was buying it, he told her "[y]ou'll see." *Transcript Vol. III* at 157. Toller lied to police at the scene, and he lied in the police interview, repeatedly changing his story of what happened, at one point identifying her ex-boyfriend as a possible suspect. This obstructionist and deceptive conduct does not reflect positively on his character.

[38] Toller has not shown that his sentence is inappropriate in light of the nature of the offenses and his character.

[39] Judgment affirmed.

Kirsch, J. and Vaidik, C.J., concur.